IN THE MATTER OF THE ESTATE OF KRYSTINA KARAS, A
MINOR, AND OF WALTER A. KARAS, JR., A MINOR.

Superior Court of New Jersey
Law Division Probate Part
Monmouth County

September 23, 1983.

108

*Patricia F. Stefanile,* Guardian ad Litem.

*James J. Addonizio* for Walter A. Karas (*Auerbach, Rudnick, Waldman, Ford* and *Addonizio,* attorneys).

McGANN, J.S.C.

Walter A. Karas has been indicted on the charge of murdering his wife and is awaiting trial. In the course of the investigation, the Prosecutor became aware that there were two infant children of the marriage; that there were assets of the mother's estate which probably devolved to the children; that Walter A. Karas had been appointed administrator of his wife's estate. The Prosecutor then applied to the court for the appointment of a guardian to protect the interests of the children. Notice of the application was given to Walter A. Karas and to maternal relatives of the children. At the hearing it appeared that the children were being well cared for by relatives and that, at least for the present, a guardian of their persons was not necessary. Social Security benefits received by the children as the result of their mother's death were being handled carefully by Mr. Karas' brother. The expense attendant upon the appointment of a guardian of the property for the purpose of handling those funds seems neither prudent nor necessary at present. Any personal estate of Mrs. Karas is not, apparently, substantial.

However, it did appear that Walter Karas and his deceased wife owned two improved parcels of real estate as tenants by the entirety. One is located in Long Branch; the other was the family residence in Oceanport. Karas has contracted to sell the Long Branch property. Title is about to close. Karas has agreed to turn over the net proceeds of that sale to his private counsel in payment of fees and expenses for his defense. It being facially apparent that there was a substantial question as to Karas' right to dispose of those proceeds as he saw fit, a guardian ad litem was appointed to represent the interests of the children and the matter was continued for the preparation of briefs and oral argument to determine a) what interest Walter Karas received as the result of his wife's death; b) whether he was entitled to dispose of that interest; c) what rights, if any, of the children were to be protected; d) what relief is appropriate.

Prior to the Probate Reform Act of 1978 the answer to this problem was clear. In *Neiman v. Hurff*, 11 *N.J.* 55 (1952), the factual situation was similar. There a husband had been convicted of murdering his wife. They had owned real estate as tenants by the entirety. In vigorous language Chief Justice Vanderbilt stated the public policy in this fashion (at page 60):

> To permit the murderer to retain title to the property acquired by his crime as permitted in some states is abhorrent to even the most rudimentary sense of justice. It violates the policy of the common law that no one shall be allowed to profit by his own wrong "nullus commondum capere protest de injuria sua propria"; See *Merrity v. Prudential Insurance Co.*, 110 *N.J.L.* 414 (E & A 1933), and *Swavely v. Prudential Insurance Co.*, 10 *N.J.Misc.* 1 (Sup.Ct.1931), and the cases there collected. This doctrine, as Vice-Chancellor Jayne pointed out in *Whitney v. Lott, supra,* 134 *N.J.Eq.* 586, at 589 "so essential to the observance of morality and justice, has been universally recognized in the laws of civilized communities for centuries and is as old as equity. Its sentiment is ageless. *Domat,* pt. 2, bk. 1; Code Nap. 272; *Mackelday's Roman Law,* 530; *Coke's Littleton* 148–B; *Broom's Legal Maxims* 9th Ed. 197." On the other hand, to divest the surviving murderer of all legal title violates or does violence to the doctrine of vested rights and would conflict with *N.J.S.* 2A:152–2:
>
> > "No conviction or judgment for any offense against this state, shall make or work corruption of blood, disinherison of heirs, loss of dower, or forfeiture of estate." [1]

The court then applied the time honored principle that while equity would not interfere with vested legal rights, it would nonetheless accomplish substantial justice by decreeing the imposition of a constructive trust. In that case it resulted in a recognition that legal title to the property was vested solely in the husband as the result of the wife's death. The equitable decree to him directed that he hold that title in trust for the benefit of his wife's beneficiary. It recognized, however, that prior to his wife's death he was a tenant in common with her as to the rents issues and profits from the property during their joint lives. He did not acquire that interest through her death. What he did do by his wrongful act was to terminate that joint life estate. Had the wife lived, that life estate would have terminated in the future on the natural death of the first of the

---

[1]*N.J.S.A.* 2A:152–2 has been preserved by *N.J.S.A.* 2C:98–3.

tenants. Where the wife's life expectancy according to the mortality tables exceeded his, he was not entitled to calculate his one-half life interest by using her expectancy as the measuring stick. Rather, because of his criminal act, that estate would be measured by his own, shorter, life expectancy. Thus the killer-husband was to receive the money value of his one-half interest in the rents, issues and profits based on his life expectancy. The heirs of the wife would receive—by way of the constructive trust imposed on him—the other one-half of the life estate and the fee in remainder.

Those basic equitable principles were recognized again in *Small v. Rockfeld*, 66 *N.J.* 231 (1974). See *Restatement, Restitution* § 188 p. 773.

As part of the Probate Reform Act of 1978 (L.1977 Ch. 412) the legislature enacted *N.J.S.A.* 3A:2A–83(b)—which, but with one slight change, has been recodified as *N.J.S.A.* 3B:7–2. That statute provides:

> Any joint tenant who criminally and intentionally kills another joint tenant thereby effects a severance of the interest of the decedent so that the share of the decedent passes as his property and the killer has no rights by survivorship. This provision applies to joint tenancies and tenancies by the entirety, joint accounts in banks, savings and loan associations, credit unions and other institutions, and any other form of coownership with survivorship incidents.

The statute is derived from § 2–803 of the Uniform Probate Code. Commenting on this section of the Probate Reform Act of 1978, Judge Clapp stated, "The new statute . . . . dealing with devolution of property in case of the homicide of a testator or other person does not effect a major change in our law." *Clapp, Review of Major Changes made by Probate Reform Act of 1978*, 102 *N.J.L.J.* 401.

Did the legislature intend to enlarge the property rights of the killer? The annotations under the Uniform Probate Code indicate that some states interpret it in that fashion. In North Dakota—*In the Matter of the Estate of Snortland*, 311 *N.W.*2d 36 (N.D.1981)—and in Montana—*In Re Estate of Matye*, 645 *P.*2d 955 (Mont.1982), the highest appellate courts have held that the wrongdoer, under the statute, retains the benefit of a

one-half interest in the property formerly held by the entireties. It must be noted, however, that even under the common law, some states had so held. See *Neiman, above* 11 *N.J.* at p. 60.

The doctrine expressed in *Neiman* accomplished substantial justice but did so by way of a constructive trust. Administration of the estate of the decedent was complicated by the fact that substantial assets of that estate were equitable not legal in nature. Transfers could be effected but only after appearances before and further decrees entered on the chancery side. There was, in addition, the problem of evaluation of the life estate for the joint lives.

The new legislation eliminates the life estate problem completely. The estate is severed immediately. The killer loses that which he had before his act—a tenancy in common with his spouse for the joint lives. There is no longer a need to measure that life estate and evaluate it. From the moment of the fatal act it no longer exists. One half of all jointly owned property or property held by the entireties then passes according to the decedent's will or by intestacy and the killer may not take any of those benefits. *N.J.S.A.* 3B:7–1.

Does the killer take the remaining one-half not only legally but free and clear of the power of equity to impose a constructive trust. Clearly he may not. There is nothing in the Probate Reform Act of 1978 to indicate an intent to invert the strong public policy expressed in *Neiman v. Hurff, above*. There was no statement accompanying the legislation to indicate such intent; no commentators have suggested that conclusion. Under those circumstances it is presumed that the legislature did not intend to change the pre-existing common law. *Blackman v. Iles,* 4 *N.J.* 82, 89 (1950). Before such intent may be found it must appear clearly and plainly from the legislation. *Id.* p. 89.

An exception to that principle of statutory construction is sometimes found where the new statute is part of a complete system of laws covering all aspects of the subject with which it

deals so that it may be said that it supercedes all prior law on that subject—whether statutory law or common law. *3 Sutherland, Statutory Construction* (Sands 4th Ed.1974) § 61.03. The adoption of the Probate Reform Act of 1978 falls into that category. However, there is nothing in *N.J.S.A.* 3B:7–2 which grants the killer a clear and unequivocal right to *use* his one-half interest. That statute does change the common law in the following regard. The common law would impose a constructive trust on the killer's remainder for the benefit of the decedent's heirs. Under the new statute the constructive trust on the killer's one-half would be for the benefit of *his* heirs. In an appropriate case that might make a difference. In this case it does not. The children are the heirs of both.

The principle remains the same—the killer may not benefit financially from his wrongful and awful act.

Here, it has not been determined that Walter A. Karas "criminally and intentionally killed" his wife. The potential is present, however, for that result. Until the determination is made it would be improper that he use those funds. Therefore, an order will be entered declaring that one-half of the net funds resulting from the sale of the Long Branch property be turned over to the guardian of the property (hereinafter named) of the two infants and that the other one-half be held in an interest-bearing account established by the guardian in the name of "Walter A. Karas, as trustee for Krystina Karas and Walter A. Karas, Jr. pursuant to order of the Superior Court dated _____" with the passbook to be retained by the guardian. Any contract for sale of the Oceanport property must be joined in by the guardian pending resolution of the criminal charges.

It must be pointed out that resolution of the criminal charges by way of a verdict favorable to Karas does not end the matter. This court may conduct a separate hearing to determine whether the killing was intentional. A preponderance of the evidence is sufficient for that finding. *N.J.S.A.* 3B:7–6.

Patricia F. Stefanile is appointed guardian of the property of the two minors. Her bond is set at $15,000. For her services as guardian ad litem she is allowed $1,000 payable equally from the estates of the minors.

NIVEEN ISKANDER, AN INFANT BY HER GUARDIAN AD LITEM, NAWAL ISKANDER AND NAWAL ISKANDER, INDIVIDUALLY, PLAINTIFFS, v. COLUMBIA CEMENT CO., INC., A CORPORATION, PALISADES PARK LUMBER AND SUPPLY CO., INC., SAMUEL ISKANDER AND YOUSSEF ISKANDER, DEFENDANTS, AND PALISADES PARK LUMBER AND SUPPLY CO., INC., THIRD PARTY PLAINTIFF, v. GARDEN STATE LUMBER PRODUCTS, A NEW JERSEY CORPORATION, THIRD PARTY DEFENDANT.

Superior Court of New Jersey
Law Division Bergen County

Decided October 20, 1983.

