951 A.2d 1075 (2008)
401 N.J. Super. 506
STATE of New Jersey, Plaintiff-Respondent,
v.
Roy L. RAMBO, Jr., Defendant-Appellant.
No. A-5923-04T4.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 2008.
Decided July 22, 2008.
*1077 Marcia Blum, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Blum, of counsel and on the brief).
Tara J. Kirkendall, Assistant Warren County Prosecutor, argued the cause for respondent (Thomas S. Ferguson, Prosecutor, attorney; Ms. Kirkendall, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges WEFING, PARKER, and R.B. COLEMAN.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Tried to a jury, defendant was convicted of murder, N.J.S.A. 2C:11-3(a)(1),(2) and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The trial court sentenced defendant to forty years in prison, thirty of which had to be served before defendant could be eligible for parole. The trial court specifically directed that the eighty-five percent parole disqualification provisions of the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, would attach to the ten years remaining on defendant's sentence after he had served the initial thirty-year mandatory minimum period. Defendant has appealed his conviction and sentence. After reviewing the record in light of the contentions advanced on appeal, we affirm defendant's conviction but remand for re-sentencing.
The victim was defendant's wife, to whom he had been married for nearly *1078 thirty years. Defendant did not deny that he shot and killed her but maintained that he acted in self-defense. By its verdict, the jury rejected that assertion.
The couple had had a contentious relationship for some time. They had been separated for nearly eighteen months at the time of the shooting, which took place in the late afternoon of August 16, 2002. That, however, was not their first separation. In 1996 they separated for approximately a year. During that separation, defendant lived at the farm with his then-girlfriend. After about one year, defendant and his wife decided to live together again, but defendant testified that it was not a complete reconciliation. He explained that it was more aimed at providing time to get their financial affairs in order so that they could eventually divorce with fewer problems. He said that he understood they had an agreement that they were free to date other people during this period. He freely availed himself of that understanding and had several intimate relationships, including one with a member of his office staff.
In April 2001 they again separated. Despite that separation, the couple continued their professional relationship, which they had maintained for many years. Defendant is a dentist, and had his office on the lower level of a split-level house located at 409 Ohio Avenue in Pohatcong. Mrs. Rambo continued to work in the office, as she had for many years, working both as a dental assistant and handling patient billing and paying the bills received. When they separated for the second time, defendant moved into the main floor of 409 Ohio Avenue while Mrs. Rambo remained at the marital residence, a farm in Alpha. Defendant acknowledged that even after their final separation they continued to attend certain social occasions as a couple and that many people did not know that, in fact, they were separated.
Defendant testified that his relationships with other women bothered Mrs. Rambo. He said that from the time of their "reconciliation" in 1996, she made constant threats against him. He testified that after he moved to the Ohio Street building, she would enter at all hours of the day or night, that he would awaken during the night to find her standing over his bed gesturing as if she had a gun. He said that she made constant threats to pour gasoline over him as he slept and ignite a fire.
He testified about the events of the week of the shooting. He said that on the afternoon of August 12, he had been in the break room with one of the hygienists with whom he admitted he had an intimate relationship. He said Mrs. Rambo burst into the room and punched the hygienist in the head. He tried to restrain Mrs. Rambo, but she was kicking him and shouting.
He testified that based upon that incident, he wanted to obtain a restraining order against his wife but that when he mentioned that the next day, the other members of the staff persuaded him not to do so, saying it would be bad for business.
He said that on the night of August 15, she silently entered his room while he was at the computer. She held a metal object in her hand and made a click as if pulling a trigger. She laughed and turned and left.
He testified that on the afternoon of August 16, she stormed upstairs with a letter she had come across, which indicated he was seeking to practice elsewhere. He said that she was very angry, and told him she was going to take care of him and this would be the last day he left the house alive. She then returned downstairs.
He continued that after the office closed for the day, she again came upstairs, demanding *1079 money. He said she was very angry and continued to threaten to kill him. He testified that he did not really respond, other than refusing to give her the money. He said he remained at his computer, letting her, in his words, "vent." He said that when she turned to leave she again said she was going to burn the house down and that he was not getting out alive. He explained he kept a gun in his room because of her constant threats and retrieved the gun from where he kept it. Putting it behind his back, he followed her down the hall. He said she walked down the stairs to the office area, turned and began screaming at him again and said this would be his last night. She turned and headed to the door to the office and he shot her in the back. He testified he was "very scared" by her constant threats and by the fact that when she got to the bottom of the stairs, she did not go out of the house but turned as if to go to the office. He said he was afraid that she had hidden a weapon in the office area. He also knew there were many flammable substances in the office.
In response to a question as to his intent when he shot her, defendant responded:
I just needed her to stop threatening me and threatening everybody else, threatening to kill me and my feeling was is that she had a weapon right then and there, or readily accessible and I just didn't want to die.
Asked if he intended to kill her, he said:
No. It was just to stop her. Just to stop, stop the threats, and stop her from doing harm to me and everybody else.
He said the fact that she walked into the office area made him fear that she was going for a weapon. He entered the room and found her standing there. He continued,
I really can't tell you what exactly she was doing, but she was kind of like coming at me. She had some things in her hand. I didn't know what they were. She also was coming at me that was  it wasn't fast, but it gave me the impression that she had something in her hand. And all I did was, was try to block her from coming at me. I thought she was lunging at me. It wasn't as if she was coming, really fast, but she was just kind of like leaning towards me. And so what I did was I did the only thing that I could think of, was just, I tapped her on the top of the head with the gun.
He admitted that after he retrieved the gun and followed her down the hall, he never told her to stop or warned her that he had a gun. He simply took aim and fired, shooting her in the back.
Immediately after the shooting, defendant placed a call to 911 to report it and advised the 911 operator that he had shot his wife. Police responded immediately to the scene. They found defendant sitting on the outside front steps awaiting their arrival. He was immediately advised of his Miranda rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and said, "She's been harassing me, harassing me, harassing me over and over."
Defendant was fully cooperative with the police. He answered all their questions and later that evening, reenacted the shooting for them at the house. He told them that their relationship had become highly acrimonious and that Mrs. Rambo had made repeated threats to burn the house down and to kill him. He said that her repeated threats had made him fear for his safety and that he had purchased a semiautomatic handgun for protection, which he kept in his bed. He said that she had come to him after the office had closed for the day, demanding $200. He said she repeatedly screamed at him that *1080 this was the last time he was going to treat her like that.
He said that she continued walking after being shot, and he fired again, but the gun jammed. He followed her into the office area and struck her in the head with the gun, fracturing her skull. At that point, the gun discharged a bullet, which entered the wall. Dr. Rambo pointed out where he had been standing when he shot his wife; a shell casing was found there.
As we noted, there was testimony that earlier in the day Mrs. Rambo became agitated when she found a letter which indicated that defendant was seeking positions with another dental practice in a different area. There was also testimony that defendant was very quiet and distant during the day, which was not his usual demeanor in the office. Defendant agreed that Mrs. Rambo had come up demanding money, saying she wanted $200 to get him arrested. He understood this to be in reference to the altercation in the office earlier that week and declined to give her the money.
Defendant raises the following arguments on appeal:
POINT I THE COURT'S REFUSAL TO CHARGE PASSION-PROVOCATION MANSLAUGHTER AS A LESSER OFFENSE OF MURDER VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL
POINT II DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO COUNSEL OF CHOICE AND DUE PROCESS OF LAW
POINT III THE INADEQUATE CHARGE ON THE DUTY TO RETREAT RENDERED THE SELF-DEFENSE INSTRUCTION FATALLY FLAWED, VIOLATING DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR TRIAL
POINT IV THE SENTENCE, WHICH CALLS FOR DEFENDANT TO SERVE 40 YEARS, 30 YEARS WITHOUT PAROLE, AND 85 PERCENT OF THE REMAINING TEN YEARS WITHOUT PAROLE, IS ILLEGAL

I
Murder that is committed in the heat of passion induced by a reasonable provocation is reduced to manslaughter. State v. Josephs, 174 N.J. 44, 103, 803 A.2d 1074 (2002); N.J.S.A. 2C:11-4(b)(2). The elements of passion/provocation manslaughter are well-known.
Passion/provocation manslaughter has four elements: the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying.
[State v. Viera, 346 N.J.Super. 198, 212, 787 A.2d 256 (App.Div.2001) (quoting State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990)), certif. denied, 174 N.J. 38, 803 A.2d 634 (2002).]
The first two elements are objective; that is, they are viewed from the perspective of a reasonable person, while the last two elements are subjective; that is, whether the defendant was actually impassioned, and whether the defendant actually did cool off before committing the fatal act. Id. at 212-13, 787 A.2d 256. "The first element of passion-provocation manslaughter requires an objective showing of adequate provocation. The provocation must be sufficiently extreme so as to cause a reasonable person to lose `mastery of his [or her] understanding. . . .'" State v. Copling, 326 N.J.Super. 417, 429, 741 A.2d *1081 624 (App.Div.1999) (quoting State v. Pratt, 226 N.J.Super. 307, 317, 544 A.2d 392 (App.Div.), certif. denied, 114 N.J. 314, 554 A.2d 864 (1988)), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000).
When considering a defendant's request to charge the jury on passion/provocation, the trial court must review the record before it in the light most favorable to the defendant. State v. Castagna, 376 N.J.Super. 323, 357, 870 A.2d 653 (App.Div.2005), rev'd on other grounds, 187 N.J. 293, 901 A.2d 363 (2006).
The threshold for a jury instruction for passion-provocation manslaughter is relatively low. The defendant need only show a rational basis for a verdict convicting the defendant of the lesser-included offense. However, the judge will not so instruct the jury if the evidence is so weak as to preclude jury consideration.
[Copling, supra, 326 N.J.Super. at 428, 741 A.2d 624 (citations and internal quotation marks omitted).]
"[W]ords alone, no matter how offensive or insulting, never constitute sufficient provocation." Castagna, supra, 376 N.J.Super. at 357, 870 A.2d 653. Several cases have, nonetheless, recognized that a course of conduct over a period of time may constitute sufficient provocation. State v. Erazo, 126 N.J. 112, 124, 594 A.2d 232 (1991) (stating that "continuing strain in a marriage fraught with violence" may constitute sufficient provocation); State v. Guido, 40 N.J. 191, 211, 191 A.2d 45 (1963) (holding that "[A] course of ill treatment which can induce a homicidal response in a person of ordinary firmness and which the accused reasonably believes is likely to continue, should permit a finding of provocation."); State v. Vigilante, 257 N.J.Super. 296, 305-06, 608 A.2d 425 (App.Div. 1992) (finding that jury could conclude that past history of violence "accumulated a detonating force which caused him to explode").
We are satisfied, nonetheless, that the record presented here is sufficiently distinguishable from those cases. In Guido and Vigilante, for instance, the defendants had been subjected to physical abuse at the hands of their ultimate victims. In Erazo, defendant contended he killed his wife in the heat of passion when she said she would seek to have his parole revoked on the basis of a fabrication; she had previously threatened to report him to parole authorities. 126 N.J. at 124, 594 A.2d 232.
Here, although defendant testified that his wife made continued threats against his life, there was no evidence of anything beyond her words. The record indicates, for instance, that when defendant left the marital residence, he left on the premises his gun cabinet to which she had ready access. He did not say that he saw any weapon in her hand on the day he shot her, only that he did not know what was in her hand. (According to the record, her keys, a pair of sunglasses and a Tupperware container were found beneath her body.) His stated fear that she might be going to retrieve a weapon cannot, in our judgment, constitute reasonable provocation for purposes of a passion/provocation instruction. The law should not have the effect of benefiting one who takes such a fatal pre-emptive action. State v. Rodriguez, 195 N.J. 165, 949 A.2d 197 (2008) ("We will not sanction the gratuitous use of deadly force. . . .").

II
Defendant's next argument requires that we set forth certain additional facts, about events which occurred after the shooting of August 19. Defendant and his wife had accumulated through the years substantial assets, the great bulk of *1082 which, despite the continuing discord between defendant and his wife, were held in joint names. The couple's primary assets were real estate: the house in Pohatcong in which defendant maintained his dental practice and the marital residence in Alpha, which was located on eleven acres of land. Both of these were held as joint tenants by the entirety. The couple also owned a parcel of land in North Carolina and a time-share in North Carolina, again in joint names.
Several days after the shooting, the couple's only child, Bruce, filed an order to show cause in the Chancery Division seeking to be appointed as administrator of his mother's estate, which he estimated at approximately three million dollars. On August 23, 2002, the court entered an order appointing Bruce Rambo administrator of the estate. The order included the following provision:
It is further ordered that (1) all assets of Roy L. Rambo will be frozen, wherever located; (2) Roy L. Rambo or any of his agents or representatives is enjoined from entering onto any property owned either jointly or individually by Roy L. Rambo and Linda Ann Rambo; and (3) Roy L. Rambo is enjoined from expending any sums of money owned individually or as a marital asset. . . .
On September 4, 2002, defendant submitted an application to be represented by the Public Defender's Office, but it was denied the following day on the ground that he was not indigent. On October 9, 2002, the trial court presiding over the criminal proceedings entered an order declaring defendant indigent and entitled to representation by the Office of the Public Defender.
In October 2002 the attorney representing Bruce Rambo as administrator of his mother's estate submitted a letter brief to the Chancery judge, setting forth the estate's position with respect to ownership of the marital property. He contended that all property acquired by Dr. Rambo and his wife since the date of their marriage in 1973 should be deemed "marital property," one-half of which belonged to the decedent and one-half of which belonged to defendant. The attorney argued that Bruce, as the only child of the decedent, succeeded to her one-half interest in the marital property and that the remaining one-half of the marital property should be held in a constructive trust pending completion of the criminal proceedings in the Law Division. In support of his argument, he cited N.J.S.A. 3B:7-1 and -2 (the "slayer statutes")[1] and In re Estate of Karas, 192 N.J.Super. 107, 469 A.2d 99 (Law Div. 1983), aff'd as modified, 197 N.J.Super. 642, 485 A.2d 1083 (App.Div.1984), certif. denied, 101 N.J. 228, 501 A.2d 907 (1985).
In November 2002 defendant appeared without counsel in Chancery in connection with the estate proceedings. He advised the court that he had no funds to hire an attorney to represent him in connection with the probate proceedings and did not wish the public defender assigned to him to be involved in the probate proceedings. The Chancery judge at several points clearly indicated to defendant that he would look favorably upon an application to have funds released for the purpose of retaining an attorney for the estate matters. Defendant did not make such an application at that time.
He did, however, in July 2003, through counsel, file a petition in the Chancery Division for an order directing release of *1083 funds to permit him to retain an attorney to defend him in the criminal proceedings. According to the papers submitted on his behalf, he sought to have one-half the proceeds of the sale of the marital assets deposited in a constructive trust, to be held pending the completion of the criminal proceedings. From that one-half, he sought one-half, to permit him to retain William Harth, Esq., a certified criminal defense attorney, to represent him on the criminal charge. He did not make any contention that he had funds in his own name, individually, to which he should have been permitted access. Defendant's son opposed that application. After a hearing, the court denied his motion and refused to release any funds to him.
Defendant filed an appeal from that order and, in connection with that appeal, filed a motion to be declared an indigent, for free transcripts, and to have counsel assigned to represent him. His motion to proceed as an indigent was granted but the motion for free transcripts and counsel was denied. Defendant did not attempt to prosecute the appeal without transcripts, and it was ultimately dismissed.
Defendant did not have a successful relationship with the several attorneys assigned from the Public Defender's Office to represent him on the criminal charges. The last attorney filed a motion to be relieved as counsel. During the course of that motion the trial court stated, "I am now convinced that no matter what this court does Dr. Rambo will not cooperate with any attorney." That motion was granted. Thus defendant represented himself at this murder trial, with the assistance of stand-by counsel who was appointed to assist him.
Defendant argues that the effect of the Chancery orders freezing his assets and denying him any access to marital funds interfered with his Sixth Amendment right to counsel. He relies upon United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), in which the Supreme Court concluded that a defendant wrongfully deprived of the counsel of his choice was entitled to a new trial, without the necessity of showing that the attorney who represented him was ineffective under the two-pronged test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
In Gonzalez-Lopez, the defendant was charged in Missouri federal court with conspiracy to distribute a controlled dangerous substance. He retained California counsel to represent him, but the District Court incorrectly denied the application of that attorney to be admitted pro hac vice. Indeed, it not only denied such admission, it refused to permit that attorney to sit at counsel table and refused to permit local counsel to consult that attorney during the course of the trial. 548 U.S. at 143, 126 S.Ct. at 2560, 165 L.Ed.2d at 416. In reversing defendant's conviction, the Court concluded, "In sum, the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation `complete.'" Id. at 146, 126 S.Ct. at 2562, 165 L.Ed.2d at 418 (footnote omitted).
There is a fundamental procedural distinction between Gonzalez-Lopez and defendant's appeal. In Gonzalez-Lopez, the orders which had the effect of depriving defendant of the counsel of his choice were entered in connection with the same matter that was under appeal. The only appeal before this court is from the judgment of conviction. He did not include in his Notice of Appeal the orders entered in the Chancery Division and, indeed, his earlier filed appeal from those orders was dismissed.
*1084 It is a fundamental of appellate practice that we only have jurisdiction to review orders that have been appealed to us. N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 561-62, 643 A.2d 987 (1994) (holding that the Appellate Division could not review a judgment not before it when a related case had been appealed); 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J.Super. 456, 459, 847 A.2d 9 (App.Div.2004) (stating that "[O]nly the judgment or orders designated in the notice of appeal . . . are subject to the appeal process and review.").
Critical to the Court's conclusion in Gonzalez-Lopez that defendant had been wrongfully denied the counsel of his choice was the fact that the denial of admission pro hac vice to his counsel of choice had been incorrect. Analysis of defendant's claim to us would inextricably require that we either uphold or reverse a determination made in Chancery which is not properly before us.
The question whether those determinations were correct in the context of defendant's desire to retain counsel is complex. It requires a close analysis of the statutory language, the legislative goals sought to be achieved by the statute and the proper balance to be given to defendant's choice of counsel. It also involves a consideration of the competing policy goals of not permitting a wrongdoer to receive a benefit from the wrongful act and requiring the taxpaying public to assume the cost of a legal defense when private funds might be available. We do not consider it inappropriate in such an instance to insist that proper appellate practice be followed. Finally, we also note that defendant made no effort, after his request for free transcripts was denied, to prepare and file a brief setting forth his legal position at that juncture, arguing that transcripts were unnecessary to resolve the purely legal issue.

III
Defendant's next argument relates to one aspect of the trial court's charge on self-defense; specifically, the trial court's failure, in the course of dealing with whether there was a duty to retreat, to define "dwelling." The trial court instructed the jury in the following manner:
Self-defense exonerates a person who uses force if in the reasonable belief that such action was necessary to prevent his death or serious injury, even though the belief was later proven to be mistaken. Accordingly, the law requires only reasonable, not necessarily correct, judgment.
Even if you find that the use of deadly force was reasonable, there are limitations on the use of deadly force. If you find that the defendant, for the purpose of causing death or serious bodily harm to another person, provoked or incited the use of force against himself in the same encounter, then the defense is not available to him.
If you find that the defendant knew that he could avoid the necessity of using deadly force by retreating, provided that the defendant knew he could do so with complete safety, then that defense is not available to him. An exception to the rule of retreat, however, is that a person need not retreat from his or her own dwelling, including a porch, unless he or she is the initial aggressor.
This instruction correctly told the jury that defendant did not have to retreat before resorting to deadly force if he was faced with the prospect of death or serious injury in his own dwelling but that he would have the duty to retreat, even in his own dwelling, if he were the initial aggressor. N.J.S.A. 2C:3-4(b)(2). *1085
Defendant contends that the charge as given was incomplete because the trial court did not define for the jury the term "dwelling." He stresses the dual nature of the premises at 409 Ohio Avenue, which served both as his office and his living quarters following the couple's final separation. We agree with the State that in this case there is no reasonable prospect that the jury could not have understood that the upper floor of this house was defendant's dwelling and had been for some months. We note, moreover, that the State never contended that self-defense was not an issue because the shooting did not occur in a "dwelling." The charge as given was entirely adequate.

IV
Defendant also challenges the manner in which the trial court structured his sentence, which had the effect of extending the period of time in which he would have to remain incarcerated without being eligible for parole. The State agrees with defendant that the parole ineligibility provisions of NERA, N.J.S.A. 2C:43-7.2, apply to the whole term imposed for murder, not just the period in excess of the mandatory thirty-year parole disqualifier which is required for any sentence for murder. N.J.S.A. 2C:11-3(b).

V
Defendant has filed a pro se supplemental brief in which he raises the following issues:
POINT I A SERIES OF FLAWED CIVIL TRIAL COURT ORDERS CAUSED SIGNIFICANT "STRUCTURAL ERRORS" BY: WRONGFULLY APPLYING N.J.S.A. 3B:7-1 ET SEQ. ("SLAYER'S ACT"); DEPRIVING THIS DEFENDANT OF HIS FINANCIAL RESOURCES; INFRINGING UPON HIS RIGHT TO RETAIN THE COUNSEL OF HIS CHOICE; AND DUE PROCESS RIGHT TO A FAIR TRIAL; IN VIOLATION OF THE UNITED STATES CONSTITUTION, AMENDS. V, VI, XIV, § 1; AND THE NEW JERSEY CONSTITUTION, ART. I, ¶¶ 1 AND 10. (ADDENDUM TO COUNSEL'S BRIEF POINT II)
POINT II THE ERRONEOUS CRIMINAL TRIAL COURT ORDER TO DECLARE DEFENDANT AS AN "INDIGENT" PREJUDICED DEFENDANT'S RIGHT TO COUNSEL AND INFRINGED ON HIS ABILITY TO RETAIN PRIVATE COUNSEL
POINT III TOTAL FORFEITURE OF DEFENDANT'S ASSETS PURSUANT TO N.J.S.A. 3B:7-1 ET SEQ. CONSTITUTES PUNISHMENT AND INFRINGEMENT ON THE UNITED STATES CONSTITUTION, AMENDMENT VIII AND THE NEW JERSEY CONSTITUTION, ART. 1, ¶ 12 PROHIBITIONS AGAINST EXCESSIVE FINES; AND INTIMATES THAT FURTHER CRIMINAL PROSECUTION VIOLATED THE UNITED STATES CONSTITUTION, AMENDS. VI, XIV AND THE NEW JERSEY CONSTITUTION, ART. 1, ¶¶ 1 AND 11 (DOUBLE JEOPARDY AND DUE PROCESS OF LAW CLAUSES) (Not Raised Below)
POINT IV THE DEFENDANT'S WAIVER OF COUNSEL (PREDICATED UPON THE ERRONEOUS DEPRIVATION OF HIS ASSETS) WAS NOT A VALID "KNOWING, INTELLIGENT AND VOLUNTARY WAIVER" OF HIS SIXTH AMENDMENT RIGHT TO COUNSEL
POINT V THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY THE TRIAL COURT'S DENIAL OF DEFENSE *1086 MOTION TO SEQUESTER LIEUTENANT DALRYMPLE AS A POTENTIAL STATE'S WITNESS, PERMITTING HIM TO BE SEATED AT THE PROSECUTION TABLE DURING THE ENTIRE TRIAL PROCESS, THEREBY CAUSING PREJUDICE TO THE DEFENDANT IN VIOLATION OF THE UNITED STATES CONSTITUTION, AMEND. XIV; AND THE NEW JERSEY CONSTITUTION, ART. 1, ¶ 1
POINT VI THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW WAS VIOLATED BY THE TRIAL COURT'S ABUSE OF DISCRETION TO DISALLOW CROSS-EXAMINATION OF STATE'S WITNESS AS TO BIAS AND FINANCIAL INTEREST IN THE OUTCOME OF THE TRIAL, IN VIOLATION OF THE UNITED STATES CONSTITUTION, AMEND. VI; AND THE NEW JERSEY CONSTITUTION, ART. 1, ¶ 10
POINT VII THE CRIMINAL TRIAL COURT COMMITTED HARMFUL ERROR BY FAILING TO TAILOR THE JURY CHARGES TO THE FACTS OF THE CASE
POINT VIII THE TRIAL COURT'S FAILURE TO GRANT DEFENDANT'S REQUEST FOR A JURY INSTRUCTION ON THE AFFIRMATIVE DEFENSE OF PREMISES DENIED DEFENDANT OF HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES CONSTITUTION, AMENDS. VI, XIV; AND THE NEW JERSEY CONSTITUTION, ART. 1, ¶¶ 1, 9, 10
POINT IX PRETRIAL INEFFECTIVE ASSISTANCE BY THE COURT-APPOINTED COUNSEL AND MULTIPLE ADDITIONAL TRIAL ERRORS DEPRIVED THE DEFENDANT OF A FAIR TRIAL
POINT X THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1, ¶ 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE ACCUMULATION OF TRIAL ERRORS (Partially Raised Below)
POINT XI THE SENTENCE IMPOSED DOES NOT PROPERLY APPLY THE NERA PERIOD OF PAROLE INELIGIBILITY PURSUANT TO N.J.S.A. 2C:43-7.2 (ADDENDUM TO COUNSEL'S BRIEF POINT IV)
POINT XII THE TRIAL JUDGE INFRINGED ON DEFENDANT'S EFFECTIVE ASSISTANCE OF COUNSEL BY RESTRICTIONS PLACED UPON STAND-BY COUNSEL
The first four points of defendant's pro se supplemental brief are various challenges to the orders entered in the Chancery Division with respect to the refusal to release funds to defendant to retain criminal defense counsel. As we noted earlier, those orders are procedurally not before us, and we decline to address the question.
In his next point, defendant asserts that the fact that Lieutenant Dalrymple of the Warren County Prosecutor's Office was permitted to sit at counsel table during the trial deprived him of due process. We are uncertain as to how defendant was prejudiced by Lieutenant Dalrymple's physical presence. There is no merit to his suggestion that the jury would have considered the State's case more worthy because two people sat at counsel table. The jury could just as easily have concluded that the State's case was weak and required two persons at counsel table. And, since Lieutenant Dalrymple did not testify during *1087 the course of the trial, there is no merit to the contention that he should have been sequestered.
The State called to the stand Jessica Lukachek, the girlfriend of Bruce Rambo, only son of defendant and his deceased wife. Defendant sought to cross-examine Ms. Lukachek to establish that she would benefit financially from the estate of his deceased wife. Defendant contends that the trial court's refusal to permit such cross-examination deprived him of due process. We disagree. The trial court was correct that Ms. Lukachek had no legal claim to any of the assets in the estate and thus had no direct pecuniary interest in it. Additionally, Ms. Lukacheck testified about her close relationship with Mrs. Rambo; we are confident her antipathy to defendant was apparent to the jury. The scope of cross-examination rests within the sound discretion of the trial court, and the trial court did not abuse that discretion in its rulings in this regard. State v. Petillo, 61 N.J. 165, 169, 293 A.2d 649 (1972), cert. denied, 410 U.S. 945, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973); Casino Reinvestment Dev. Auth. v. Lustgarten, 332 N.J.Super. 472, 492, 753 A.2d 1190 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000).
Defendant's next contention is that the trial court erred in not tailoring its jury charge to the facts of the case. Defendant's brief stresses the importance of a trial court molding its charge to reflect the facts of the case at hand. State v. Robinson, 165 N.J. 32, 754 A.2d 1153 (2000). That principle cannot be gainsaid. Defendant, however, does not demonstrate how that principle was violated here; i.e., in what areas of the charge, more specificity was called for. Despite the length of the trial (and the extensive number of transcripts supplied to us in connection with this appeal), the issue at trial was fundamentally a simple one: did defendant act in self-defense when he shot and killed his wife.
Defendant's next contention is that the trial court committed reversible error when it declined to give an instruction to the jury on the use of force in defense of premises. N.J.S.A. 2C:3-6. We disagree. The statute refers to the use of force "to prevent or terminate what [the actor] reasonably believes to be the commission or attempted commission of a criminal trespass by such other person in or upon such premises." Defendant's wife, however, was not a trespasser; she was a co-owner of the property, a staff member of the business and had keys, permitting her entry as she wished.
In defendant's next contention, he asserts that he was deprived of the effective assistance of counsel at various points in the proceedings. We decline to address these complaints on this direct appeal. Contentions of ineffective assistance of counsel are more effectively addressed through petitions for post-conviction relief, at which point an appropriate record may be developed. State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992).
Defendant includes within this point heading an argument that several of the trial court's evidentiary rulings deprived him of fair trial. None of the challenged rulings were an abuse of the wide discretion vested in the trial court and provide no basis to overturn the judgment.
Defendant also notes that immediately prior to the trial court commencing its charge, it made the following remark to the jury: "I understand Mrs. Romagnoli [the court clerk] indicated at one time you wanted a side-bar with me, but we never went that far." Defendant complains that neither party was ever informed during the trial that at least one member of the *1088 jury wanted to speak to the trial court and that the denial of that request denied him a fair trial. There is no support for such a conclusion. Although the remark may be somewhat cryptic, it is important to see it in context. The entire statement was:
Also, you know during the course of the trial I was required to make certain rulings on admissibility, referred to as side-bars, and I understand Mrs. Romagnoli indicated at one time you wanted a side-bar with me, but we never went that far.
We consider defendant's contention that the trial court refused to respond to an inquiry from the jury to be wholly speculative and not warranted from the context.
Defendant also complains of several remarks by the prosecutor in her summation. Those comments addressed to defendant's admitted infidelities were proper comments upon the evidence. Defendant complains that the prosecutor in her summation misstated the law with respect to self-defense. The jury was repeatedly told that the instructions of the court on the legal issues were binding, not any comments the attorneys might have made in summation. The court's instructions on self-defense were accurate and corrected any misimpression that may have been conveyed by the summation.
Defendant also complains that the trial court's charge on murder was defective because it precluded the jury from considering self-defense. There is no merit to the claim; the jury was fully instructed on the law governing self-defense. Nor is there any merit to the remainder of his arguments with respect to the court's charge.
Defendant complains of the denial of his request for free transcripts in connection with his attempt to appeal from orders of the Chancery Division. As we noted earlier, we only have jurisdiction over defendant's criminal appeal.
Having found no error, we reject defendant's invocation of the principle of cumulative error.
Defendant makes a generalized complaint, without any specific references, that the trial court placed improper restrictions on stand-by counsel. We decline to comb the record searching for any examples, indeed if any exist. Our review of the record indicates no instances in which defendant was not permitted to consult stand-by counsel when he wished to do so. Defendant was not entitled, however, to have stand-by counsel assume an active courtroom role in his defense.
Defendant's conviction is affirmed. The matter is remanded to the trial court for resentencing.
NOTES
[1] N.J.S.A. 3B:7-1 and -2 were in effect at the time of the shooting. They have since been repealed and replaced by N.J.S.A. 3B:7-1.1 to -7.7. The amended statute does not affect the analysis.