74 A.3d 10

BELMONT CONDOMINIUM ASSOCIATION, INC., PLAINTIFF–RESPONDENT, v. DEAN GEIBEL, METRO HOMES, L.L.C., WATERFRONT MANAGEMENT CORPORATION, COMMERCE CONSTRUCTION MANAGEMENT, L.L.C., BADGER ROOFING CO., INC., LATORRE CONSTRUCTION, MAYITO'S PLASTERING, INC., TAAS CONSTRUCTION CORP., INC., AND TRI–STATE SHEARING & BENDING, INC., DEFENDANTS, AND MONROE STATION ASSOCIATES, L.L.C., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 8, 2013—Decided July 9, 2013.

54

58

Before Judges PARRILLO, SABATINO and CARROLL.

*Brian D. Barr* and *Timothy J. O'Shaughnessy* (*Mauro Lilling Naparty LLP*) of the New York bar, admitted pro hac vice, argued the cause for appellant (*Cooper Levenson April Niedelman & Wagenheim, P.A.,* and *Mr. O'Shaughnessy,* attorneys; *Mr. Barr* and *Caryn L. Lilling,* of counsel and on the briefs).

*Eileen A. Lindsay* argued the cause for respondent.

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

This appeal arises from an action by plaintiff, the Belmont Condominium Association, Inc. (plaintiff or Association), against, among others, defendant Monroe Station Associates, L.L.C. (defendant or Monroe Station), the sponsor, developer and general contractor of the Belmont, a seven-story, thirty-four unit condominium building in Hoboken. The complaint alleged negligence, fraud, and violations of The Planned Real Estate Development Full Disclosure Act, *N.J.S.A.* 45:22A–21 to –56 (PREDFDA), and the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –20 (CFA). All claims arose from the construction of the Belmont, and from certain pre-construction statements by defendant relating to the developer/builder's experience.

The jury returned a verdict in favor of plaintiff on its negligence claim, finding defendant eighty percent responsible. The jury also found that defendant had made two deceptive statements under the CFA, and pursuant thereto, the court trebled the damages against defendant. Over defendant's objection, the court awarded prejudgment interest on the entire damages award, including the

treble portion. Plaintiff was also awarded attorney's fees, which included prejudgment interest.

On appeal, defendant argues that plaintiff's CFA claims should have been dismissed as a matter of law because: (a) the Association lacked standing to aggregate ascertainable losses of members who did not purchase their units from Monroe Station; (b) the representations in the public offering statement (POS) were true at the time they were made and are not accompanied by "aggravating circumstances"; and (c) the CFA claims, based on the alleged misrepresentations in the POS and accompanying marketing materials pertaining to defendant's background and experience, are barred by the statute of limitations. In addition, defendant contends that plaintiff also lacks standing because the windows for which plaintiff claims damages are not part of the "common elements" of the condominium. Lastly, defendant attributes error to the court in (a) permitting the jury to apportion the damages; (b) improperly trebling the prejudgment interest on the punitive portion of the CFA damages award; (c) admitting references to the adverse health effects of mold in the Belmont, which unduly prejudiced defendant; and (d) permitting plaintiff to voluntarily dismiss its claim against defendant Commerce Construction Management without prejudice. For reasons that follow, we affirm the damages award in part and reverse in part; reverse the award of prejudgment interest on the punitive portion of the CFA damages award; and remand for the purpose of vacating the award for the cost of the replacement windows and the recalculation of the prejudgment interest award.

Construction of the Belmont began in late 1998 and was completed in early 2000. Subcontractors on the project included Badger Roofing Co., Inc. (Badger Roofing), Mayito's Plastering, Inc. (Mayito's), Taas Construction Corp., Inc. (Taas), Tri–State Shearing & Bending, Inc. (Tri–State), and Lattore Construction (Lattore). All thirty-four units in the Belmont were sold by defendant to individual purchasers between February and June 2000.

In 1999, as part of the Belmont's development, and before the building was even built, Monroe Station filed a POS pursuant to the PREDFDA, which provided that "[t]here are no known defects in the building (a part of which) you are purchasing, nor in the common area and facilities, that you could not determine by a reasonable inspection." Attached to the POS were certain marketing materials, which stated that the potential buyers would be getting a "Proven Developer and Construction Management Team which has overseen the building and renovation of Over 400 Single Family & Condominium Homes, and over 1,000,000 Sq. Ft. Of Office/Commercial/Retail Development."

Actually, Dean Geibel, who was the owner and general manager of Monroe Station, later admitted, in September or October 2000, that the Belmont was the first building he had constructed. In fact, Geibel did most of the development of the Belmont, which was part of the pre-construction phase of the building process. According to Geibel, he assembled a construction team consisting of himself, Paul Freed, and Aram Papazian, whom he brought on for their combined experience, and made them the project/construction managers. It was the combination of the experience of all three of them that, he believed, supported the representation in the marketing materials that the buyers would be getting a "proven" developer. However, Papazian denied being a part of either the Belmont's "development team" or "construction management team," although that was the original plan. Freed, on the other hand, did have extensive constructive experience before his involvement with the Belmont project.

Practically from the beginning, the building was plagued by water leaks. Christine Sheedy, one of the original unit purchasers and a board member of the Association from 2001 to 2003, experienced water leaking through the molding around her windows sometime in late 2000 or early 2001. She complained about the leaks, but assumed that they were fixed because she did not have any further leaks in her unit until 2007, when she noticed water infiltration into one of her bedrooms. At that time, she also

noticed mold growing around the window sills and would scrub it off three or four times a year. However, she had learned that there was mold in the walls of the Belmont back in 2005 or 2006.

Another owner, Eric Barr, who had purchased his unit from one of the original purchasers in January or February 2002, and who served as board president of the Association from July 2005 to May 2009, also experienced water leaking into his unit in December 2003 through the high-hat lighting fixtures in the kitchen. The then property manager, Waterfront Management Corporation, apparently remedied the problem because it no longer leaked when it rained. However, one year later, in December 2004, water infiltrated Barr's unit again, this time into his living room.

Barr immediately notified the new property manager, Realty Express LaBarbera (Realty Express), who learned for the first time about water leaks at the Belmont. Its subsequent investigation had uncovered water infiltrating the two top-floor units of the Belmont through the air conditioning ducts, as well as water leaking into the closet of a fourth floor unit. Realty Express hired a handyman, who applied sealant to the air conditioning ducts on the roof. Realty Express also hired Jetco, an exterior waterproofing company, to help assess the true extent of the problem.

During its investigation, Realty Express also discovered roofing tar product cans left on the roof, which had deteriorated the roofing membrane underneath. Realty Express contacted Badger Roofing, who made the necessary repairs.

Realty Express also identified a crack that ran the length of the south wall of the Belmont. Jetco patched the crack, and caulked and applied elastomeric paint to all four sides of the Belmont. Notwithstanding their efforts, there were continuing complaints of water infiltration into the building.[1]

---

[1] In December 2005, a unit owner notified the Association that she had found a significant amount of mold in her unit. The Association retained AirSafe Mold Specialists (AirSafe) to investigate the problem.

To help identify the source and scope of the water infiltration, Realty Express hired Hudson Chimney and Roofing (Hudson Chimney), and in January 2006, John Estes, a licensed home inspector. Estes performed leak testing that suggested that the leaks were coming from the corner of the building. He also determined that there was a caulk failure in the joint between the Belmont and the adjoining building. Based on Estes's recommendations, Realty Express hired someone to do some repair work.

In June 2006, the Association invited defendant to come inspect the building and help resolve the water infiltration problem. As a result, on June 21, 2008, Art Johnson of Metro Homes [2], and Vincent Martinez, a senior project manager at Kipcon Incorporated, an engineering and inspection firm, met with Estes and Barr to inspect the building. They inspected three units that day, and throughout, Estes pointed out the tops of the balconies and the copings he believed were the source of the leaks; he never indicated the windows, or the areas around them, as the source.

Based on his inspection, and the information provided to him by the Association, Martinez could not determine the condition of the building "as built" because repairs and alterations had already been made before the Association ever consulted with the developer, architect or engineer of the building. Nor did the Association or Estes obtain any of the manufacturers' specifications, such as architectural or engineering drawings, before making the repairs.

Martinez's inspection revealed several maintenance issues, such as the lack of caulking, caulking issues at the joints, clogging of some of the drains on the roof, and the discharge of water onto the roof from the HVAC unit. Martinez's company, Kipcon, prepared a report wherein it detailed the results of its investigation and site inspection:

---

[2] After construction of the Belmont, Geibel formed Metro Homes, L.L.C. (Metro Homes) solely for the purpose of "branding" his company, Monroe Station.

It is Kipcon's understanding that the Belmont Condominium Association has employed someone other than Metro Homes, LLC as their management company for approximately the last 2 years. Various building maintenance deficiencies were identified at the time of our June 21, 2006 visit that also have the potential for water infiltration and water infiltration related problems. These included: leaking of the HVAC condenser units and condensate lines on the roof top; cracked, worn caulk at building joints, flashing and seals; leakage stains (old and new) located on the ceilings and ceiling tiles in the condominium units directly located below the roof, etc. No maintenance records were available for our review in order to verify ongoing building maintenance while obvious lack of maintenance existed.

In conclusion, the fact that numerous physical alterations have been made to the building without the opportunity for Metro Homes, LLC, Kipcon, the design architect and engineer or the representative of the material companies to inspect the building prior to these changes, combined with the apparent lack of preventive building maintenance, there is no possible way to conclude that the construction of the building by Metro Homes, LLC created any leaks or mold. Because of the alterations made by Diego under the supervision of Belmont Condominium Association, any suggestion that the apparent water infiltration is a direct cause of the way Metro Homes, LLC built the building can and will only be a speculation. Any changes made to the building should have been inspected, detailed and supervised by qualified professionals. It is realistic to say that the alterations made, if not properly completed, could have and will continue to create damage or water infiltration to the building. It is also a possibility that if the "leak testing" of the building was not done correctly or overseen by a qualified professional, such as an architect or engineer, the test itself could have actually caused damage to the building.

After receiving Kipcon's report, the Association stopped making repairs, the cost of which up to then had amounted to $111,551. Instead, in January 2007, the Association filed suit against defendant, and eventually the project subcontractors, essentially claiming negligence, fraud and violations of the PREDFDA and the CFA. At the ensuing trial, the testimony focused on the origin and cause of the water infiltration, with the Association's experts attributing the problem to construction defects and defendant's experts blaming poor or inadequate maintenance.

Kevin Helsby of Wiss, Janney, Elstner Associates, Inc. (Wiss Janney), an engineering, architecture, and material science consulting firm, was qualified as plaintiff's expert exterior building envelope consultant. His investigation revealed that there were multiple points of water entry into the Belmont. Unsealed penetrations and a joiner in the metal column cover on the seventh

floor balcony were sources of water infiltration. "No flashings were observed at the head, jamb or sill of the windows. There was no sealant applied between the stucco cladding and the window frame. And there was [sic] open gaps between the stucco cladding and the window frame."

Also, there was "no flashing installed between the sheathing and the window frame. There's no gap between the stucco and the frame. And there's absolutely no sealant or any other material to seal that transition between the stucco and the window frame." He observed wide open gaps between sheets of metal with "no evidence of sealant or anything to prevent water from getting into that gap at any of the locations . . . observed."

Although Helsby agreed that caulk deteriorates and has to be maintained, he concluded that none of the conditions observed at the Belmont were the result of a lack of maintenance. He believed that the building was improperly constructed and that maintenance was not designed to correct construction deficiencies.

Helsby found that most of the leaking came through the sides of the building with no windows. In fact, none of the forty windows on the back was damaged or had to be repaired or replaced. Many of the forty windows on the front of the building did not need to be replaced either. Helsby recommended repair or replacement as necessary based on the conditions at the time of remediation. He did not identify any leak in the roof.

Michael Bressler, an associate principal at Wiss Janney, was qualified as plaintiff's expert in architecture, with a specialty in building envelope investigations. He had worked with Helsby and their investigation revealed deficiencies in the construction of the Belmont. Specifically, the exterior insulation and finishing system (EIFS) and stucco were not installed properly. The architectural drawing provided for a gap between the windows and the EIFS or stucco to allow for the installation of backer-rods and sealant; no such gaps were left. Bressler concluded, within a reasonable degree of certainty, that Mayito's failure to leave a gap prevented the proper installation of backer-rods and sealant, which contribut-

ed to water infiltration into the building. He was of the opinion that water migrated into the building around the perimeters of the windows because they were not flashed. Also, the way Mayito's installed the stucco and EIFS against the vents and penetrations contributed to the influx of water into the building because it prevented the proper installation of sealant.

Bressler also concluded that the way Badger Roofing installed the coping covers contributed to the migration of water into the interior. The nine black metal column posts at the front of the building caused leaks into the building on the front of the building; there was no sealant in the joints, and therefore, they were not installed in compliance with good building practices. However, his investigation did not reveal any leaking in the roof.

Although Bressler agreed that caulk deteriorated over time and needed to be maintained, there was nothing that he observed that led him to believe that the water infiltration problem was caused by a lack of maintenance. He attributed fault for the water infiltration to Badger Roofing, Mayito's, and Taas.

David Kichula, of Air Consulting Services, was qualified as plaintiff's expert in industrial hygiene and mold investigation, identification and remediation. He performed extensive testing at the Belmont and concluded that remediation was necessary; it was not acceptable to leave mold in the walls. The sheathing, insulation and sheetrock had to be removed because there was no way to sanitize them.

Herman Sabath, Ph.D., a board certified microbial consultant, and plaintiff's environmental consultant expert, testified that mold eats the cellulotic fibers in the sheetrock which leads to deterioration. If left untreated, the insulation materials—gypsum board, sheetrock and other building materials—would all deteriorate. He also noted the potential health problems at the Belmont because of the presence of mold, namely, allergies, infections, immunological problems, and "sick building syndrome." Delay in fixing the water infiltration and mold remediation would add to potential health problems.

William Pyznar, a professional engineer and managing partner of The Falcon Group, an engineering and architecture consulting firm, was plaintiff's expert in engineering, with a specialty in cost analysis. He was retained by plaintiff to prepare a construction analysis and report for the remedial work relating to the existing water infiltration, construction deficiencies and mold infestation.

According to Pyznar, the total estimated cost to remediate the exterior and interior of the Belmont was approximately $1.825 million, consisting of approximately $984,000 to remediate the exterior and, approximately $615,000 for the interior. Contained in his total estimate was a 20% contingency allowance, a 16.6% engineering design and construction administration allowance and a 2.5% performance bond.

Pyznar's estimate included the cost of removing all of the EIFS and stucco, 80% of the sheathing, and the replacement of all eighty windows, notwithstanding the fact that those repairs were beyond the scope of repairs recommended by plaintiff's experts. Also, his estimate included the cost of total remediation of all thirty-four units, notwithstanding the fact that not all of the units were tested and some were tested and determined to be normal.

In contrast to the Association's experts, Russell Burner, defendant's expert engineer in water infiltration investigation and evaluation, concluded that, within a reasonable degree of engineering water infiltration analysis investigation certainty, poor maintenance was a factor in the water infiltration at the Belmont. There was clear evidence that caulking was not maintained; there were failed caulking joints that were not repaired, and there was an open joint in the coping. He was amazed to see that, in 2009, there were still open channels where water could infiltrate the building. He believed that a surface-mounted kind of caulking would have been an acceptable remedy to the water infiltration problem.

Richard Lester, president of Garden State Environmental, an industrial hygiene consulting firm, was defendant's expert industrial hygienist and environmental consultant, who performed vari-

ous environmental tests at the Belmont and reviewed the results of plaintiff's environmental expert's testing. Lester concluded within a reasonable degree of certainty, that there was no evidence that all thirty-four units needed to be remediated. While plaintiff's cost expert made the general statement that all units needed to be remediated, none of plaintiff's other experts provided a scope of work of what remediation should be done. Based on all the testing done, including his own, he could not determine the scope of work that should be done as of the time of trial.

John Stevens, vice president and general manager of Kipcon, was qualified as defendant's building inspection and cost estimating expert. From September 2007 through May 2008, he observed plaintiff's engineers from Wiss Janney inspect the building and perform tests. For the most part, he concurred with their recommendations regarding the exterior of the building.

He concluded, however, that repairing the flashing and copings up at the balcony levels would correct the water infiltration problem; he did not believe it was necessary to replace the windows. He recommended covering the window flange with water-proofing membrane or water-proofing flashing, which would seal the windows.

Stevens estimated that it would cost $741,000 to remediate the exterior and interior of the Belmont. His estimate varied significantly from the Falcon Group's estimate in part because he did not allocate any money for replacement windows, while the Falcon Group allocated $240,000 for the replacement of all eighty windows.

Further, his estimate included remediation or partial remediation of seventeen of the thirty-four units, depending on the experts' recommendations; if a unit was not tested or the experts stated that the unit was fine, it was excluded from his calculations. The Falcon Group's estimate included the costs for total remediation of all thirty-four units. Finally, the Falcon Group's estimate contained a 30% architect fee; Stevens's estimate did not include such a fee because he did not feel it was necessary.

As noted, the jury returned a verdict in favor of plaintiff and against defendant Monroe Station, Badger Roofing, and Mayito's; it found Taas not liable. It also found that plaintiff was not negligent for failing to inspect and maintain the building, and awarded $2,186,675 in damages, finding defendant 80% responsible ($1,749,340), and Badger Roofing and Mayito's each 10% responsible ($218,667.50).

The jury having found defendant in violation of the CFA, the court trebled the $1,749,340 damages against defendant to a total of $5,248,020, and further awarded prejudgment interest on that entire $5,248,020 damages award in the amount of $1,123,004. Final judgment in the amount of $6,371,024, plus attorney's fees of $865,653.28 (which included prejudgment interest), was entered.

This appeal follows.

## I.

### (A)

As a threshold matter, defendant contends that the Association lacked standing to aggregate the ascertainable loss of members who were not the original purchasers, and thus failed to demonstrate reliance on the alleged misrepresentations or any causal relationship between defendant's unlawful conduct and plaintiff's ascertainable loss. We disagree.

Historically, New Jersey courts have taken "a much more liberal approach on the issue of standing than have the federal [courts]." *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y.*, 58 *N.J.* 98, 101, 275 *A.*2d 433 (1971) (holding tenant's association had standing to maintain action against landlord concerning matters of common interest). And both our Legislature and courts "have given wide recognition to suits by associations." *Id.* at 109, 275 *A.*2d 433.

Pursuant to the New Jersey Condominium Act, *N.J.S.A.* 46:8B–1 to –38 (NJCA), the association "shall be responsible for the

administration and management of the condominium and condominium property, including but not limited to the conduct of all activities of common interest to the unit owners." *N.J.S.A.* 46:8B–12. "Association" is defined as "the entity responsible for the administration of a condominium, which entity may be incorporated or unincorporated." *N.J.S.A.* 46:8B–3. "[T]he association shall be an entity which shall act through its officers and may enter into contracts, *bring suit and be sued." N.J.S.A.* 46:8B–15(a) (emphasis added). An association "may assert tort claims concerning the common elements and facilities of the development *as if the claims were asserted directly by the unit owners individually." N.J.S.A.* 46:8B–16(a) (emphasis added).

"[T]he clear import, express and implied, of the statutory scheme is that the association may sue third parties for damages to the common elements, collect the funds when successful, and apply the proceeds for repair of the property." *Siller v. Hartz Mountain Assocs.,* 93 *N.J.* 370, 377, 461 *A.*2d 568, *cert. denied,* 464 *U.S.* 961, 104 *S.Ct.* 395, 78 *L.Ed.*2d 337 (1983). In *Siller,* the Court noted:

> The statutory provisions empowering the association to sue, imposing the duty on it to repair, and authorizing it to charge and collect "common expenses," coupled with the prohibition against a unit owner performing any such work on common elements, are compelling indicia that the association may institute legal action on behalf of the unit owners for damages to common elements caused by third persons.
>
> [*Id.* at 378, 461 *A.*2d 568 (footnote omitted).]

The Court also explained the policy considerations in support of that conclusion:

> Avoidance of a multiplicity of suits, economic savings incident to one trial, elimination of contradictory adjudications, expedition in resolution of controversies, accomplishment of repairs, and the positive effect on judicial administration are supportive policy reasons. Moreover, the financial burden on an individual owner may be so great and so disproportionate to his potential recovery that he could not or would not proceed with litigation.
>
> [*Id.* at 379, 461 *A.*2d 568 (footnote omitted).]

In concluding the causes of action to remedy defects in the common elements of a condominium development belong to the condominium association, the Court further noted:

> It would be impractical indeed to sanction lawsuits by individual unit owners in which their damages would represent but a fraction of the whole. If the individual owner were permitted to prosecute claims regarding common elements, any recovery equitably would have to be transmitted to the association to pay for repairs and replacements. A sensible reading of the statute leads to the conclusion that such causes of action belong exclusively to the association, which, unlike the individual unit owner, may apply the funds recovered on behalf of all the owners of the common elements.
>
> [*Id.* at 381, 461 A.2d 568.]

■ Thus, under the NJCA, a condominium association, acting in a representative capacity on behalf of the individual unit owner, has the *exclusive* right to sue a developer for construction defects related to the common elements, *N.J.S.A.* 46:8B–12, –15(a), –16(a), and although unit owners may sue the developer for defects pertaining to their units, individual unit owners are prohibited from repairing or altering common elements, *N.J.S.A.* 46:8B–18, and therefore generally lack standing to sue for damages to the common elements. *Siller, supra,* 93 *N.J.* at 377, 381–82, 461 A.2d 568; *Soc'y Hill Condo. Ass'n v. Soc'y Hill Assocs.,* 347 *N.J.Super.* 163, 169, 789 A.2d 138 (App.Div.2002).[3]

By parity of reasoning, where the alleged damages involve the common elements, nothing in the NJCA bars the Association from bringing a CFA claim against the developer as well. As noted, the NJCA authorizes the Association to bring suit in a representative capacity on behalf of the individual unit owners for damages to the common elements. *N.J.S.A.* 46:8B–12, –15(a), –16(a). In fact, we have previously allowed a homeowners association, in its representative capacity, to assert a CFA claim. In *Port Liberte Homeowners Ass'n v. Sordoni Constr. Co.,* 393 *N.J.Super.* 492, 924 A.2d 592 (App.Div.), *certif. denied,* 192 *N.J.* 479, 932 A.2d 30 (2007), the manufacturer of an allegedly defective exterior moisture barrier system used during construction allegedly made misrepresentations or omissions to the developer in order to

---

[3] Consistent with the NJCA, the Belmont Condominium Master Deed provides that the Association, not the individual unit owners, have the responsibility and authority to make all necessary repairs to the common elements and to bring suit against the developer for defects to the common elements.

induce the developer to use its product. *Id.* at 498–500, 924 *A.*2d 592. That happened before the plaintiff, the homeowners association, was even formed. *Id.* at 497, 924 *A.*2d 592.

At issue was whether the homeowners association, formed after the misrepresentations or omissions complained of were made, had standing to assert common law and consumer fraud claims against the manufacturer of a product used by the developer in the construction of the common elements. *Id.* at 497, 924 *A.*2d 592. We held "that a condominium association has standing to assert claims for common law fraud and consumer fraud against third-party contractors and materialmen for defects in the construction of the common elements, regardless of whether the association formally existed at that particular point in time." *Id.* at 501, 924 *A.*2d 592. We explained that to hold that the association did not have standing "produces an unjust result and is contrary to the legislative scheme permitting a condominium homeowners association to institute suit to recover damages to the common elements." *Id.* at 501–02, 924 *A.*2d 592 (citing *N.J.S.A.* 46:8B–14, –15(a), and –16(a)).

For purposes of standing, we perceive no meaningful distinction between *Port Liberte* and the present matter which, in our view, presents the more compelling case. In the former, the association had to step into the shoes of the developer because the alleged misrepresentations were not made to, or intended for, the plaintiff association or the individual unit owners. Here, on the other hand, the misrepresentations in the marketing materials were made directly to, and intended for, the potential unit owners to induce them to purchase a unit. In either case, the Association represents the unit owners who were harmed by the proven damage to the common elements. Therefore, our holding in *Port Liberte* has equal, if not more persuasive, application here:

> [B]ecause the CFA allows "any person who has suffered an ascertainable loss" to sue under the CFA, *N.J.S.A.* 56:8–19, an association, charged with the maintenance and repair of the common areas of a condominium, that discovers defects in the construction of its common element areas, has standing to pursue a claim under the CFA. . . .

[*Id.* at 505, 924 *A.*2d 592.]

Accordingly, because the Association, through its construction defect and CFA claims, sought to recover for damages to the common elements, it is unquestionably the real party in interest and therefore has standing to pursue its complaint against defendant.

█ Defendant's alternative argument that the Association lacked standing because it failed to demonstrate reliance on the alleged misrepresentation is even less persuasive. The Association was not required to demonstrate reliance for defendant to be liable under the CFA.

█ The CFA provides:

Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

[*N.J.S.A.* 56:8–19.]

Thus, to state a claim under the CFA, a plaintiff must allege three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *N.J. Citizen Action v. Schering–Plough Corp.*, 367 *N.J.Super.* 8, 12–13, 842 *A.*2d 174 (App.Div.) (citing *Cox v. Sears Roebuck Co.*, 138 *N.J.* 2, 24, 647 *A.*2d 454 (1994)), *certif. denied*, 178 *N.J.* 249, 837 *A.*2d 1092 (2003).

As to "unlawful conduct" under the CFA, the Court in *Cox, supra,* 138 *N.J.* at 17, 647 *A.*2d 454, explained that "a person must commit an 'unlawful practice' as defined in the legislation." The CFA "specifies the conduct that will amount to an unlawful practice in the disjunctive," *id.* at 19, 647 *A.*2d 454, providing:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the

knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, *whether or not any person has in fact been misled, deceived or damaged thereby,* is declared to be an unlawful practice. [*N.J.S.A.* 56:8–2 (emphasis added).]

██ The CFA is "one of the strongest consumer protection laws in the nation." *Cox, supra,* 138 *N.J.* at 15, 647 *A.*2d 454 (internal quotation omitted). "Courts have emphasized that like most remedial legislation, the [CFA] should be construed liberally in favor of consumers." *Ibid.* "A plaintiff need not even show reliance on the violation of the [CFA] as long as an ascertainable loss resulting from defendant's conduct is demonstrated." *Leon v. Rite Aid Corp.,* 340 *N.J.Super.* 462, 468, 774 *A.*2d 674 (App.Div. 2001). *See also Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 607–08, 691 *A.*2d 350 (1997) (holding that reliance is not required in suits under the CFA because liability results from "misrepresentations whether 'any person has in fact been misled, deceived or damaged thereby' ") (quoting *N.J.S.A.* 56:8–2); *N.J. Citizen Action, supra,* 367 *N.J.Super.* at 15, 842 *A.*2d 174 ("[T]he element of traditional reliance required to be pleaded and proven in a common law fraud or misrepresentation case, ... need not be proven in order to recover for damages pursuant to the CFA[.]"). Accordingly, in order to prevail, a plaintiff need only demonstrate a causal connection between the unlawful practice and ascertainable loss. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 246, 872 *A.*2d 783 (2005); *Gennari, supra,* 148 *N.J.* at 604, 691 *A.*2d 350.

The present case is analogous to *Gennari, supra,* 148 *N.J.* at 590–92, 691 *A.*2d 350, in which purchasers of homes in a real estate development brought an action alleging, among other things, CFA violations against Weichert Realtors (the real estate brokerage firm which marketed the development), as well as the builder, the builder's wife (who was a Weichert agent), and the corporation owned by the builder and his wife. Several Weichert agents affirmatively misrepresented to potential purchasers that "[the builder] was an experienced builder who had built hundreds

of quality homes throughout New Jersey." *Id.* at 592, 691 *A.*2d 350. However, the builder generally had always worked under the supervision of others and his workmanship was "disastrous." *Ibid.*

The Court held that Weichert's representations misled the purchasers to believe that Weichert was familiar with the builder and his workmanship, and that the builder was "an exacting and demanding builder of real substance." *Ibid.* In holding Weichert liable under the CFA, the Court determined that the Weichert agents had "misled, deceived, and damaged" the plaintiffs. *Id.* at 608, 691 *A.*2d 350.

The Court also rejected Weichert's argument that the plaintiffs did not rely on its representations because they conducted independent investigations into the builder's qualifications prior to purchasing their houses. *Id.* at 607, 691 *A.*2d 350. Plaintiffs did not need to demonstrate reliance since Weichert's liability arose from the CFA, "which does not require proof of reliance." *Id.* at 607, 691 *A.*2d 350.

Defendant cites *Society Hill, supra,* 347 *N.J.Super.* at 163, 789 *A.*2d 138, *Marrone v. Greer & Polman Construction, Inc.,* 405 *N.J.Super.* 288, 964 *A.*2d 330 (App.Div.2009), and *Chattin v. Cape May Greene, Inc.,* 216 *N.J.Super.* 618, 524 *A.*2d 841 (App.Div.), *certif. denied,* 107 *N.J.* 148, 526 *A.*2d 209 (1987), in support of its reliance argument. Those cases, however, are distinguishable.

*Society Hill* is easily distinguishable because there, the association's claims admittedly involved damage to individual units rather than to the "common elements." *Society Hill, supra,* 347 *N.J.Super.* at 169–73, 789 *A.*2d 138. The court held that the association lacked standing because the claims were "not matters of 'common interest'; rather, they [were] in the nature of 'individual grievances' necessarily left to litigation brought by individual unit owners." *Id.* at 172–73, 789 *A.*2d 138.

Neither *Chattin* nor *Marrone* involved suits brought by a condominium association. Here, plaintiff is an association, which

consists of all the unit owners in the Belmont. Moreover, plaintiff has demonstrated a causal relationship between the unlawful practice and ascertainable loss. The POS and accompanying marketing materials were distributed to all the original purchasers in order to induce them to purchase their units. Furthermore, while the Association was not required to demonstrate actual reliance on defendant's misrepresentations, it nevertheless produced the testimony of Sheedy, an original purchaser, who testified that she received, read and relied on the POS and the accompanying marketing materials in deciding to purchase her unit in the Belmont.

Finally, on this same point, we address the concern raised that it was only the original purchasers who received the alleged misrepresentations from the developer. Firstly, we reiterate the general principle that the Association, on behalf of *all* unit owners, is the proper "party in interest" to bring construction defect and CFA claims for damages to the common areas sustained by *any* or *all* of the unit owners and accordingly may recover *all* the damages necessary to repair or correct the defects to the common elements and to which it may be statutorily entitled. Secondly, we discern no sound reason in law or policy to reduce the recoverable damages for subsequent purchasers. To be sure "[n]o reported New Jersey decision has determined whether damages relating to defects in common elements should be allocated so that the association can only collect on behalf of a certain percentage of the unit owners and not those who purchase after the defects become known." Wendell A. Smith et al., Estis & Li, *New Jersey Condominium & Community Association Law* § 16:4 (Gann 2013). "Whether a deduction should be made for subsequent purchasers from a Consumer Fraud Act award in a suit brought by an Association against a developer has not yet been addressed by the courts." *Ibid.* However, the majority of jurisdictions outside of New Jersey have declined to apportion such damages among condominium owners holding undivided interest in the common elements.

In *Stony Ridge Hill Condominium Owners Ass'n v. Auerbach*, 64 *Ohio App.*2d 40, 410 *N.E.*2d 782, 785–86 (1979), the Ohio Court of Appeals declined to apportion damages awarded with respect to defective or substandard roofs on the condominium buildings and garage. In rejecting the defendant developer's argument that not all 24 unit owners were entitled to recover for the alleged misrepresentations since "only four unit owners of the 24 owners testified that they sustained damage as a result of the alleged misrepresentations pertaining to the 'twenty-year roof,'" *id.* at 785, the court explained:

> The Owners Association, on behalf of all unit owners and for each of them, is the proper party to bring an action for damages pertaining to the common area sustained by any or all of the unit owners. Payment by defendants of only one-sixth of the roof damage, representing the share of four unit owners, and the consequent repair of only one-sixth of the roof would still leave the roof in the same leaky condition, and would be the equivalent of giving plaintiff no legal remedy or relief whatever.
>
> [*Id.* at 786 (internal citation omitted).]

In *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.*, 406 *So.*2d 515, 519–20 (Fla.Dist.Ct.App.1981), the Florida Court of Appeals refused to apportion damages awarded with respect to defective or substandard fencing and ceiling roof assemblies. The court explained:

> We hold that as to common elements, the [condominium owners] may recover the entire damages on either theory [, implied warranty or negligence], albeit the subsequent or remote purchasers will benefit thereby. To conclude otherwise and apportion the damages would penalize the original purchasers. In order for [the owners] to receive the benefit of their bargain and be made whole, the amount of damages awarded must equal the sum necessary to correct the condition.
>
> [*Ibid.*]

In *Chapman Place Ass'n v. Prokasky*, 507 *N.W.*2d 858, 863–64 (Minn.Ct.App.1993), the Minnesota Court of Appeals reversed the trial court's apportionment of damages awarded to a condominium association for defects in the common elements. There, the trial court had reduced the damages awarded for units purchased after the defects had become apparent. *Id.* at 861. The court found that such a reduction created a windfall for the contractor, and also cautioned: "Reduction of damages on this basis could encour-

age negligent contractors to prolong litigation with the hope that additional units conveyed will reduce the amount of recoverable damages." *Id.* at 864. *See also Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*, 295 *Md.* 693, 458 *A.*2d 805, 812–13 (1983) (rejecting the argument that the individual unit owners' entitlement to damages should be limited by their percentage of ownership).

Thus, a majority of jurisdictions outside New Jersey have declined to apportion damages awarded for defects in the common elements among condominium owners, holding that an association can recover all the damages necessary to repair or correct such defects. We are in accord with this view as consistent with the principles underlying both the NJCA and the CFA as well as with sound policy that to otherwise apportion or reduce the damages awarded would create a windfall for the tortfeasor-developer at the expense of innocent consumers.

### (B)

In its next challenge to plaintiff's CFA claim, defendant contends that the claim fails as a matter of law because the POS representations were true at the time they were made and are not accompanied by "aggravating circumstances." We disagree.

A claim of literal truth does not constitute a defense to a plaintiff's CFA claim. "A false statement of fact is not ... an essential ingredient of a plaintiff's cause of action based on affirmative wrongdoing." *Leon, supra,* 340 *N.J.Super.* at 470, 774 *A.*2d 674. "The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice. Intent is not an essential element." *Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 372, 378, 371 *A.*2d 13 (1977). *See also Barry v. Arrow Pontiac, Inc.,* 100 *N.J.* 57, 69, 494 *A.*2d 804 (1985) (The question is "whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.").

In *Miller v. American Family Publishers,* 284 *N.J.Super.* 67, 87, 663 *A.*2d 643 (Ch.Div.1995), the court held that "a claim of literal truth will not constitute a defense to a charge that the overall impression created by an advertisement is misleading and deceptive to an ordinary reader." If a defendant's statements are found to be misleading and deceptive at trial, "then a finding of literal accuracy will not bar a conclusion that [they] violate[d] the Consumer Fraud Act." *Id.* at 85, 663 *A.*2d 643. The court, citing *United States Postal Service v. Allied Treatment, Inc.,* 730 *F.Supp.* 738, 739 (N.D.Tex.1990), explained:

"To determine whether an advertisement or solicitation makes a false or misleading representation, the court must consider the effect that the advertisement, taken as a whole, would produce on one with an ordinary and unsuspecting mind. A court must consider the implications of an advertisement because, if it is designed to deceive the reader, an advertisement 'may be completely misleading' even if 'every sentence separately considered is literally true.' *Donaldson v. Read Magazine* [*Inc.,* 333 *U.S.* 178, 188, 68 *S.Ct.* 591, 597, 92 *L.Ed.* 628, 640 (1948)]. Taking an advertisement or solicitation as a whole means considering not only what it states literally, but also what it reasonably implies."

[*Miller, supra,* 284 *N.J.Super.* at 86, 663 *A.*2d 643.]

In *Leon, supra,* 340 *N.J.Super.* at 471, 774 *A.*2d 674, we noted that "[i]t is well to remember that the Consumer Fraud Act is aimed at more than the stereotypic con man. 'The statutory and regulatory scheme is also designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services.' " *Ibid.* (quoting *Div. of Consumer Affairs v. Gen. Elec. Co.,* 244 *N.J.Super.* 349, 353, 582 *A.*2d 831 (App.Div.1990)).

■ Here, defendant's statement that "[t]here are no known defects in the building (a part of which) you are purchasing, nor in the common areas and facilities, that you could not determine by a reasonable inspection," while literally true when made, because they were made before construction, clearly had the capacity to mislead an average reader. Accordingly, defendant's claim of literal truth does not serve as a defense to plaintiff's CFA claims.

■ Defendant's other argument that to support its CFA claim, plaintiff had to demonstrate "aggravating factors" because the

alleged misrepresentations constituted a "warranty" is equally unpersuasive. A plaintiff need not demonstrate "aggravating factors" when the "unlawful practice" is an affirmative misrepresentation.

*N.J.S.A.* 56:8–2 provides, in pertinent part, that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, ... whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." "[T]o establish a violation of the [CFA], a plaintiff need not prove an unconscionable commercial practice." *Cox, supra,* 138 *N.J.* at 19, 647 *A.*2d 454. The CFA "specifies the conduct that will amount to an unlawful practice in the disjunctive," and therefore, "[p]roof of any one of those acts or omissions or of a violation of a regulation will be sufficient to establish unlawful conduct under the [CFA]." *Ibid.*

In *Cox,* the Court explained that

"a breach of warranty, or any breach of contract, is not per se unfair or unconscionable ... and a breach of warranty alone does not violate a consumer protection statute." *D'Ercole Sales, [Inc. v. Fruehauf Corp.,* 206 *N.J.Super.* 11, 25, 501 *A.*2d 990 (App.Div.1985) ]. Because any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach. *DiNicola v. Watchung Furniture's Country Manor,* 232 *N.J.Super.* 69, 72, 556 *A.*2d 367 (App.Div.) (finding that breach of warranty in supplying defective furniture and denying that defect existed was not unconscionable), *certif. denied,* 117 *N.J.* 126, 504 [564] *A.*2d 854 (1989); *D'Ercole Sales, supra,* 206 *N.J.Super.* at 31, 501 *A.*2d 990 (holding that breach of warranty for malfunctioning tow truck and refusal to repair was not unconscionable practice).

[*Id.* at 18, 647 *A.*2d 454.]

Plaintiff is not alleging an unconscionable commercial practice; rather, it is defendant's alleged affirmative misrepresentations contained in the POS and accompanying marketing materials that form the basis of plaintiff's CFA claims. Moreover, the alleged misrepresentations were not "homeowner warranties" and, therefore, defendant's reliance on *DiNicola, supra,* 232 *N.J.Super.* at

69, 556 *A.*2d 367 and *D'Ercole, supra,* 206 *N.J.Super.* at 11, 501 *A.*2d 990, is misplaced. Furthermore, neither *DiNicola* nor *D'Ercole* dealt with affirmative misrepresentation as the basis of a CFA violation.

In sum, literal truth is not a defense to plaintiff's CFA claims. Furthermore, contrary to defendant's contention, plaintiff was not required to demonstrate "aggravating factors" to support its CFA claims, which were based on the unlawful practice of affirmative misrepresentation.

### (C)

Defendant next contends that plaintiff's CFA claims based on its representations concerning its "background and experience" are barred by the applicable statute of limitations, because the unit owners knew that those statements were false more than six years prior to the filing of the complaint. Defendant also argues that claims based on the statement regarding the "no known defects" in the building are barred by the statute of limitations because "all sales [of the units in the building] closed prior to June 30, 2000 with the complaint being filed in January 2007."

Plaintiff's CFA claims did not accrue until it suffered an ascertainable loss. Nevertheless, even if plaintiff's claims accrued at an earlier date, the statute of limitations was properly tolled under the discovery rule.

The applicable statute of limitation is set forth in *N.J.S.A.* 2A:14–1 (emphasis added), which provides: "Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, ... *shall be commenced within 6 years next after the cause of any such action shall have accrued.*"

Plaintiff's CFA claims require it to prove an ascertainable loss, among other things. *See N.J. Citizen Action, supra,* 367 *N.J.Super.* at 12–13, 842 *A.*2d 174. "It is also clear that the date when a cause of action is deemed to have 'accrued' is 'the date upon which

the right to institute and maintain a suit first arises.'" *Holmin v. TRW, Inc.*, 330 *N.J.Super.* 30, 35, 748 *A.*2d 1141 (App.Div.2000) (quoting *Hartford Accident & Indem. Co. v. Baker*, 208 *N.J.Super.* 131, 135–36, 504 *A.*2d 1250 (Law Div.1985)), *aff'd o.b.*, 167 *N.J.* 205, 770 *A.*2d 283 (2001). Therefore, "[u]ntil a plaintiff has suffered 'damages,' ... he cannot maintain a suit for damages based on fraud since his cause of action has not yet accrued. It will accrue only when 'damage' is inflicted." *Id.* at 36, 748 *A.*2d 1141.

Accordingly, contrary to defendant's contention, plaintiff's CFA claim did not accrue when it learned of the falsity of defendant's representations; rather, the cause of action accrued when plaintiff suffered an ascertainable loss. Plaintiff did not suffer an ascertainable loss until sometime after 2001, most likely 2004, when the true nature and extent of the water infiltration problem first became evident, and thus was within six years of the filing of the complaint. *See N.J.S.A.* 2A:14–1.

Nevertheless, even if plaintiff's claim accrued on an earlier date, the statute of limitations was properly tolled under the discovery rule. Under the discovery rule, "the statute of limitations begins to run only when the client suffers actual damage and discovers, or through the use of reasonable diligence should discover, the facts essential to the malpractice claim." *Grunwald v. Bronkesh*, 131 *N.J.* 483, 494, 621 *A.*2d 459 (1993). Stated another way, "in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer*, 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973).

In the present case, the discovery rule would act to toll the applicable statute of limitations until 2004, just three years prior to the filing of the complaint, because that was the first time plaintiff, through its new property manager Realty Express, had reason to believe that it had suffered an ascertainable loss.

## II.

In contrast to the standing challenge just discussed, we agree with defendant's argument that the Association lacked standing to seek damages for the windows because the windows are personal to the unit owners and are not part of the "common elements" of the Belmont. We therefore conclude that the court erred by denying defendant's motion to dismiss the claim for damage to the windows and by granting plaintiff's motion holding that it had standing to pursue that claim.

As previously noted, pursuant to the NJCA, a condominium association may sue the developer for construction defects related to the common elements, *Siller, supra,* 93 *N.J.* at 377, 461 *A.*2d 568, and a unit owner may sue the developer "to safeguard his interests in the unit he owns[,]" *id.* at 382, 461 *A.*2d 568; however, an "association may not sue the developer for damages to a unit[,]" *Society Hill, supra,* 347 *N.J.Super.* at 169, 789 *A.*2d 138 (citations omitted). Thus, we must determine whether the windows are part of the individual units or the "common elements" of the building.

"The physical extent of [a unit] depends upon what has been included in the common elements." *Siller, supra,* 93 *N.J.* at 382, 461 *A.*2d 568. Whether an item is a common element "may be ascertained by examination of the statutory definition and the master deed." *Ibid.; see also N.J.S.A.* 46:8B–3(d).

The NJCA defines common elements to include:

as to any improvement, the foundations, structural and bearing parts, supports, main walls, roofs, basements, halls, corridors, lobbies, stairways, elevators, *entrances, exits and other means of access, excluding any specifically reserved or limited to a particular unit or group of units;* . . . .

[*N.J.S.A.* 46:8B–3(d)(ii) (emphasis added).]

The failure to specifically include "windows" within common elements in subparagraph (ii) is a telling omission, as is that subparagraph's explicit exclusion from common elements of "entrances, exits and other means of access ... specifically reserved or limited to a particular unit."

"[A]s a general matter the thrust of [*N.J.S.A.* 46:8B–3(d) ] is to define common elements in general as those elements existing or intended for common use." *Society Hill, supra,* 347 *N.J.Super.* at 170, 789 *A.*2d 138. Therein, we summarized the distinction between common elements and a unit as follows:

One easy way to visualize a condominium unit is as a cube of air, the tangible boundaries of which are usually the finished side of the interior sheetrock, ceilings and floors. While many condominiums vary this definition slightly (driven, in part, by allocating maintenance responsibilities), the condominium unit is generally seen by owners as the "inside" of their structure while the shell and "outside" of the building is a common element.

[*Society Hill, supra,* 347 *N.J.Super.* at 172, 789 *A.*2d 138 (quoting *Powell on Real Property* § 54A.01[2] 11–13 (2001)).]

We emphasized that one can distinguish a common from unit element by examining whether the unit owner or association bears responsibility for repairing those building components. *Id.* at 170–71, 789 *A.*2d 138.

Generally speaking, unit windows are not intended for common use, rather, they are intended for the personal use of individual unit owners. If considered part of the "common elements," however, then the Association would be responsible for repairing or replacing any and all windows worn or damaged through ordinary use. Furthermore, the individual unit owners would be prohibited from replacing or altering the windows in their own units without permission from the Association. Such a result seems illogical and, in our view, not within the contemplation of the NJCA's definition of common elements.

As noted, a condominium's master deed can further specify common elements, *N.J.S.A.* 46:8B–3(d)(viii), and the trial judge relied on his reading of this document in determining that he could not find "any clear statement in the master deed from which [it] can draw a conclusion that windows are part of the unit":

[Section 4(c)(2) ] of the master deed ... says ... the general common elements shall also include by way of description but not [of] limitation ... [t]o the extent that they are part of the building ... exterior wood trim, precast window sills and lintels....

....

[Y]ou know what are we to do, bifurcate the sills, the lintels from the claim and say the actual interior window glass, which I don't think is part of this claim? It deals with water infiltration.

. . . .

[T]he [c]ourt finds that substantial components of a window are included as common elements, quite frankly.

Of course, the construction of a written document solely on the basis of its own terms, is a question of law, *Spinelli v. Golda*, 6 *N.J.* 68, 79–80, 77 *A.*2d 233 (1950); *Hofer v. Carino*, 4 *N.J.* 244, 250, 72 *A.*2d 335 (1950); *Driscoll Constr. Co. v. State of N.J., Dep't of Transp.*, 371 *N.J.Super.* 304, 313, 853 *A.*2d 270 (App.Div.2004), as is whether a term is clear or ambiguous, *Nester v. O'Donnell*, 301 *N.J.Super.* 198, 210, 693 *A.*2d 1214 (App.Div.1997), and we review legal issues de novo, *Toll Bros. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002), owing no special deference to the trial court's interpretation. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

Turning to the language in the master deed, the trial court was correct in its observation that there was no "clear statement in the master deed from which [it] can draw a conclusion that windows are part of the unit." The inverse, however, is also correct: there is no "clear statement" in the master deed that windows are part of the common element. Our reading of the relevant portions of the document together with the NJCA persuades us that the court erred in concluding that "substantial components of a window are included as common elements" in the master deed.

Article 3 of the Belmont master deed, entitled "Description of the Units," provides:

(a). Boundary. . . . Each Unit is intended to contain all space within the area bounded by the interior surface of its perimeter walls and the lowermost floor and its uppermost ceiling as follows:

(1) *Sides*. The sides of each Unit are imaginary vertical planes along and coincident with the innermost surface of the studding of the perimeter walls. Where no wall exists, the side is an imaginary vertical plane along and coincident with the exterior surface of the perimeter glass windows or doors located on the perimeter of such Unit. The sides of each such Unit are bounded by the bottom and the top of the Unit.

. . . .

(4) *Items Included in Unit.* Each Unit shall include, and each Unit Owner shall be responsible for, all plumbing lines, vent stacks, gas lines, electrical lines, CATV lines, and telephone lines located within the perimeter walls, floors and roof of the Unit (including roof penetrations for same).... In addition and without limitation on the foregoing, each Unit also includes all built-in appliances, fixtures, interior doors, interior walls and partitions, gypsum board and/or other facing material on the walls and ceilings thereof, the inner decorated and/or finished surface of the floors (including all flooring tile, ceramic tile, finished flooring, carpeting and padding) and all other improvements located within such Unit described, which are exclusively appurtenant to such Units, although all or part thereof may not be located within the Unit....

Article 4 of the Belmont master deed, entitled "Description of General and Limited Common Elements," provides:

(a). *Common Elements Defined.* The "Common Elements" of the Condominium (the "Common Elements") include, but are not limited to, those areas, corridors, spaces and other parts of the Building and all Facilities therein which are not part of the Units and which are for the common use of the Units and the Unit Owners or which are necessary or convenient for the existence, maintenance or safety of the Property.

. . . .

(c). *General Common Elements.* The General Common Elements shall also include by way of description but not by way of limitation (to the extent the same are applicable to the Condominium):

. . .

(2) To the extent they are part of the Building: concrete spread footings; I-beams; footings; masonry walls; exterior brick; exterior stucco; wire mesh; vapor barriers; *exterior wood trim; precast window sills and lintels;* fypon trim & cornice work; exterior lighting fixtures; exterior front door and related hardware and mail slot; front door buzzer intercom panel; street numbers; brick sidewalk pavers; concrete curb; vinyl siding, if any; exterior fencing; roofing membrane system; plumbing, sewer line, and electric and gas conduits running from street service to the Building and/or Units as the case may be; interior hallway lights and heaters; interior hallway finishes including sheet rock; interior hallway floor tile, carpet, stairs & handrail;

(3) All other Facilities and equipment in the Building that serve or benefit or are necessary or convenient for the existence, maintenance, operation, or safety of the Property not included in the Units as defined above;

(4) Any and all other Common Elements in the Property not included in the Units....

The master deed is not ambiguous. It simply makes no specific reference to the unit windows. However, the failure of the master deed to specifically list the unit windows as part of the "common

elements" adds substantial support to the conclusion that they are part of the individual units.

Contrary to the trial court's conclusion, the master deed's reference to the "exterior wood trim; precast window sills and lintels" as part of the "common elements" does not support the conclusion that the unit windows are part of the "common elements." "Exterior wood trim, precast window sills and lintels" are not components of a window; rather, they are essentially the "hole" in the wall in which an actual window fits. In contrast, unit windows are located within the individual units and are, generally speaking, intended for the use of the individual unit owner. Therefore, claims for damages thereto are not matters of "common interest"; rather, they are in the nature of "individual grievance[s]" necessarily left to litigation brought by individual unit owners. *See Siller, supra,* 93 *N.J.* at 378, 461 *A.*2d 568 (quoting *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y.,* 58 *N.J.* 98, 109, 275 *A.*2d 433 (1971)).

So, although the master deed does not provide a clear answer, when it is read in conjunction with the NJCA, *see Siller, supra,* 93 *N.J.* at 382, 461 *A.*2d 568, it is apparent that unit windows are part of the individual units and not the common elements. Therefore, the Association lacked standing to sue for damages to the unit windows and the award for the cost of the replacement windows must be vacated.

### III.

 Defendant contends that the court erred by failing to dismiss plaintiff's claim for "interior damages" because plaintiff failed to demonstrate which "construction defect" caused what interior damages, and failed to attribute damage to either defendant or any of its subcontractors.

The trial court determined that there was "enough evidence and testimony in the record that the jury could determine who was responsible[,]" and therefore reasonably apportioned damages among the defendants, noting:

> They've seen charts how much it's going to cost. You showed them charts how much everything is going to cost. They know who was supposed to do what. They've seen scope of work, they've seen contracts, they've heard experts, they know who was supervising. I think that that's entirely enough evidence presented to the jury to be able to do that.

We agree.

A plaintiff must "prove damages with such certainty as the nature of the case may permit." *Lane v. Oil Delivery, Inc.*, 216 *N.J.Super.* 413, 420, 524 *A.*2d 405 (App.Div.1987). "New Jersey law favors the apportionment of fault among responsible parties." *Boryszewski v. Burke*, 380 *N.J.Super.* 361, 374, 882 *A.*2d 410 (App.Div.2005) (citing *N.J.S.A.* 2A:15–5.1 to –5.8), *certif. denied*, 186 *N.J.* 242, 892 *A.*2d 1288 (2006). *See also Scafidi v. Seiler*, 119 *N.J.* 93, 109–14, 574 *A.*2d 398 (1990); *Reichert v. Vegholm*, 366 *N.J.Super.* 209, 213, 840 *A.*2d 942 (App.Div.2004). Thus, generally, a plaintiff must apportion or relate damages to a defendant's wrongful acts. *O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am.*, 361 *N.J.Super.* 264, 274, 825 *A.*2d 524 (App.Div.2003), *certif. denied*, 178 *N.J.* 452, 841 *A.*2d 90 (2004).

The Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.8, mandates the apportionment of fault where "the question of liability is in dispute." *N.J.S.A.* 2A:15–5.2(a). The law states:

a. In all negligence actions . . . in which the question of liability is in dispute, . . . the trier of fact shall make the following as findings of fact:

(1) The amount of damages which would be recoverable by the injured party regardless of any consideration of negligence or fault, that is, the full value of the injured party's damages.

(2) The extent, in the form of a percentage, of each party's negligence or fault. The percentage of negligence or fault of each party shall be based on 100% and the total of all percentages of negligence or fault of all the parties to a suit shall be 100%.

[*N.J.S.A.* 2A:15–5.2(a).]

"The New Jersey Supreme Court has recognized that, although rare, cases may arise where it is extremely difficult or impossible to apportion damages." *Boryszewski, supra*, 380 *N.J.Super.* at 375, 882 *A.*2d 410 (citing *Campione v. Soden*, 150 *N.J.* 163, 184–85, 695 *A.*2d 1364 (1997)). "In such cases, the Court favors 'rough

apportionment.' " *Ibid.* (quoting *Campione, supra,* 150 *N.J.* at 184–85, 695 *A.*2d 1364).

In *Campione,* the Court articulated the standards for trial courts to follow in cases in which apportionment of fault is either extremely difficult or impossible based upon the evidentiary record developed at trial:

> At the conclusion of a trial where allocation of damages among multiple tortfeasors is an issue, the trial court is to determine, as a matter of law, whether the jury is capable of apportioning damages. The absence of conclusive evidence concerning allocation of damages will not preclude apportionment by the jury, but will necessarily result in a less precise allocation than that afforded by a clearer record. If the court establishes as a matter of law that a jury would be incapable of apportioning damages, the court is to apportion damages equally among the various causative events. If the court concludes that the jury would be capable of apportioning damages, the jury should be instructed to do so.
>
> [*Campione, supra,* 150 *N.J.* at 184–85, 695 *A.*2d 1364 (internal citations omitted).]

In *Boryszewski, supra,* 380 *N.J.Super.* at 383–84, 882 *A.*2d 410, we noted that some governing principles emanate from the apportionment case law:

> Apportionment is favored under New Jersey law. When the question of liability is in dispute, a charge on apportionment is generally appropriate. Regardless of which party bears the burden of proof, the quantum of evidence required to qualify for an apportionment charge is low. The law favors apportionment even where the apportionment proofs are imprecise, allowing only for rough apportionment by the trier of fact. Indeed, an arbitrary apportionment—equally among the various causative elements-may be appropriate where the trial court determines, as a matter of law, that the jury would be incapable of making an apportionment.

Here, the issues of liability and damages were intertwined and as a result, the jury was able to apportion damages among the responsible defendants according to their percentages of liability. Its determination was both logical and supported by the record.

In fact, defendant concedes that the "[e]xterior damages were capable of apportionment." "For example, failure to flash around a window could be allocated to the party responsible for that work, *i.e.* either Monroe Station as general contractor, or the stucco installer. The cost to flash is the measure of damage for that specific defect." However, defendant contends that *"no expert or fact witnesses* determined what interior damages were caused by what 'construction defect.' "

In essence, there was only one construction defect: the failure to properly seal or waterproof the building. As the jury found, defendants Monroe Station, Badger Roofing and Mayito's all contributed to that failure, and all the damages to the building resulted from that failure. The distinction that defendant attempts to draw between the interior and exterior damages is not meaningful. All of the "interior damages" were directly caused by the "exterior damages." Because the building was not properly sealed and/or waterproofed (the "exterior damages"), water infiltrated the building, which caused damages to the interior of the building (the "interior damages"). Moreover, it was not necessary, as defendant intimates, to trace every drop of water to ascertain its point of entry into the building since, in a case like this, "rough apportionment" is favored. *Boryszewski, supra,* 380 *N.J.Super.* at 375, 882 *A.*2d 410 (citing *Campione, supra,* 150 *N.J.* at 184–85, 695 *A.*2d 1364). Thus, we conclude that there was sufficient evidence from which the jury could apportion the liability of the respective defendants, as well as the damages.

## IV.

Defendant contends that the court erred by improperly awarding prejudgment interest on the punitive portion of the CFA damages award. We agree.

In awarding prejudgment interest on the entire CFA damages award, the court reasoned:

Considering the legislative purpose of the CFA that it is remedial and should be construed liberally to accomplish its objective of deterrence and punishment, it appears that trebling prejudgment interest is appropriate as part of the damages for a CFA injury.

In general, we review awards of interest and the calculation of those awards under an abuse of discretion standard. *Baker v. Nat'l State Bank,* 353 *N.J.Super.* 145, 177, 801 *A.*2d 1158 (App.Div.2002). A reviewing court must not disturb an award of prejudgment interest unless the trial judge's decision represents "a manifest denial of justice." *Musto v. Vidas,* 333 *N.J.Super.* 52,

74, 754 *A.*2d 586 (App.Div.), *certif. denied,* 165 *N.J.* 607, 762 *A.*2d 221 (2000).

*N.J.S.A.* 56:8–19, which provides for an award of treble damages, attorney's fees, filing fees and costs, does not specifically provide for an award of prejudgment interest. However, prejudgment interest may be awarded pursuant to *Rule* 4:42–11(b), which provides:

> Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses.

"Although prejudgment interest in a tort action is expressly governed by *R.* 4:42–11(b), 'the award of prejudgment interest on contract and equitable claims is based on equitable principles.' " *Litton Indus., Inc. v. IMO Indus., Inc.,* 200 *N.J.* 372, 390, 982 *A.*2d 420 (2009) (quoting *Cnty. of Essex v. First Union Nat'l Bank,* 186 *N.J.* 46, 61, 891 *A.*2d 600 (2006)). "The equitable purpose of an award of prejudgment interest is compensatory, 'to indemnify the claimant for the loss of what the moneys due him would presumably have earned if the payment had not been delayed.' " *Ellmex Constr. Co. v. Republic Ins. Co.,* 202 *N.J.Super.* 195, 212–13, 494 *A.*2d 339 (App.Div.1985) (quoting *Busik v. Levine,* 63 *N.J.* 351, 358, 307 *A.*2d 571, *appeal dismissed,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973)), *certif. denied,* 103 *N.J.* 453, 511 *A.*2d 639 (1986). But "prejudgment interest is not a penalty but rather . . . its allowance simply recognizes that until the judgment is entered and paid, the defendant has had the use of money rightfully the plaintiff's." Pressler & Verniero, *Current N.J. Court Rules,* comment 2 on *R.* 4:42–11 (2013).

The provisions of the CFA permitting the recovery of treble damages are punitive in nature. *See Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 185, 892 *A.*2d 1240 (2006) ("Treble damages

are intended to punish, and only partly to compensate, and therefore have all the hallmarks of punitive damages.") (Albin, J., dissenting); *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 12, 860 *A.*2d 435 (2004) ("The purpose of [the CFA] remedies is not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices."). "[P]rejudgment interest on punitive damages should not be permitted." *Zalewski v. Gallagher,* 150 *N.J.Super.* 360, 373, 375 *A.*2d 1195 (App.Div.1977).

In *Belinski v. Goodman,* 139 *N.J.Super.* 351, 360, 354 *A.*2d 92 (App.Div.1976), we held "that prejudgment interest was not intended by *R.* 4:42–11(b) to have application to awards of punitive damages and that the trial court was in error in ruling otherwise." We explained:

While *R.* 4:42–11(b) does not expressly except punitive damage awards from its scope, the policy considerations which gave rise to its adoption suggest that result. Prejudgment interest is assessed on tort judgments because the defendant has had the use, and the plaintiff has not, of moneys *which the judgment finds was the damage plaintiff suffered.* It is thus clearly implied that interest on the *loss* suffered by a plaintiff as a result of defendant's tortious conduct is what was contemplated by the rule.

... Interest is not punitive ...; here it is compensatory, to indemnify the claimant for the loss of what the moneys due him would presumably have earned if payment had not been delayed ...

An award of punitive damages, by its own terms, is punitive in nature and purpose and the award of interest thereon no less so. Such damages do not compensate plaintiff for a loss sustained; their purpose is to punish a defendant for wrongful, malicious conduct and as a deterrent to such conduct in the future.

[*Id.* at 359, 354 *A.*2d 92 (internal quotations and citations omitted).]

In awarding prejudgment interest on the entire CFA damages award, the trial court incorrectly focused on the purpose and intent of the CFA's statutory treble damages remedy, which is punitive, *Liberty Mut. Ins. Co., supra,* 186 *N.J.* at 185, 892 *A.*2d 1240, and *Furst, supra,* 182 *N.J.* at 12, 860 *A.*2d 435, rather than the purpose and intent of *Rule* 4:42–11, which is compensatory. *See Busik, supra,* 63 *N.J.* at 358, 307 *A.*2d 571; Pressler & Verniero, *supra,* comment 2 on *R.* 4:42–11. Since the award of

prejudgment interest was granted pursuant to *Rule* 4:42–11, not the CFA, the court erred by doing so.

 The Association has not cited, and our research has failed to disclose, any binding case law that supports an award of prejudgment interest on treble damages. Accordingly, we hold that an award of prejudgment interest is limited to the compensatory portion of a CFA damages verdict. We therefore vacate the award of prejudgment interest in this matter, and remand for recalculation of prejudgment interest on only the compensatory portion of the CFA damages verdict.

V.

 Defendant next argues that plaintiff's repeated reference to the negative "health effects" of the mold, throughout the trial, unduly prejudiced defendants and denied them a fair trial. We discern no error here.

At trial, defendants moved to have plaintiff's environmental diagnostic expert, Sabath, barred from testifying about potential health effects from mold in the building, since there were no personal injury claims. The court denied the motion, finding that under *N.J.R.E.* 403, the testimony was "not so overly prejudicial and unfair to be inherently inflammatory." The court allowed Sabath to testify for the limited purpose of explaining why plaintiff claimed it was necessary to remediate the mold, but precluded him from testifying extensively about the details of the potential adverse health effects of mold. Prior to Sabath's testimony, the court gave the following limiting instructions:

> I want to instruct the jury that you're going to hear testimony now of plaintiff's expert witness, Dr. Sabath, and the purpose of the testimony is to explain to you why the plaintiff claims that the mold in the Belmont needs to be removed.
>
> There are no allegations, and I want the jury to be very clear on this, that any resident has become ill or have [sic] any health complaints as a result from existing mold, nor are there any claims for personal injury or illness[, or] any other allegations of sickness involved in this trial.

> Therefore, the jury is to consider the testimony of this witness only for the purpose to explain the reasons why the plaintiff claims that the mold needs to be removed, okay.

Plaintiff's counsel questioned Sabath about "the potential health problems associated with mold that mandate, as [he had opined in his report], that th[e] mold should not be left in the walls of the Belmont." The court overruled defendant's counsel's objection, and permitted Sabath to answer the question:

> I'm going to allow it and the jury understands that there are no allegations anyone at the Belmont had any of these health problems. This is just prospective, in case it's not removed what can happen. That's what the plaintiff is alleging.
>
> You'll understand no one claims they've had any of these health hazards, or diseases, or illnesses.

Thereafter, plaintiff's counsel questioned Sabath about the differences between specific types of mold. The court sustained defendant's counsel's objection. Sabath testified that the Belmont was "grossly contaminated with a variety of fungal species, a number of which have been associated with serious health problems in human beings and progressive material deterioration." When he attempted to name the specific fungal species, defense counsel objected. Plaintiff's counsel indicated that she just wanted Sabath to state the names of the fungal species, and the court said Sabath could name them.

Shortly thereafter, out of the presence of the jury, plaintiff's counsel requested "more guidance" from the court about what testimony was permitted. The court explained that he could testify "that mold causes serious health problems," but that he could not "go into the specific diseases which he's not qualified to testify as to." He could not testify about "each type of mold and what it could cause."

A trial court's evidentiary rulings are "entitled to deference absent a showing of an abuse of discretion, *i.e.*, there has been a clear error of judgment." *State v. Marrero*, 148 *N.J.* 469, 484, 691 *A.*2d 293 (1997). *See also Verdicchio v. Ricca*, 179 *N.J.* 1, 34, 843 *A.*2d 1042 (2004) (Admissibility of evidence falls within the broad discretion of the trial judge.). On appellate review, a trial court's

evidentiary ruling must be upheld "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off the mark that a manifest denial of justice resulted." *Green v. N.J. Mfrs. Ins. Co.*, 160 *N.J.* 480, 492, 734 *A.*2d 1147 (1999) (internal quotations omitted).

Whether evidence should be excluded under *N.J.R.E.* 403 because its prejudicial effect substantially outweighs its probative value is an issue remitted to the discretion of the trial court. *State v. Wilson*, 135 *N.J.* 4, 20, 637 *A.*2d 1237 (1994). *N.J.R.E.* 403 provides:

> Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.

The burden is on the party urging exclusion of evidence to convince the court that the *N.J.R.E.* 403 considerations should control. *Rosenblit v. Zimmerman*, 166 *N.J.* 391, 410, 766 *A.*2d 749 (2001). The moving party must demonstrate not only that the contested evidence is prejudicial, but that the factors favoring exclusion "substantially" outweigh its probative value. *Ibid. See also State v. Morton*, 155 *N.J.* 383, 453, 715 *A.*2d 228 (1998), *cert. denied*, 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Evidence claimed to be unduly prejudicial may be excluded only where its probative value "is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the basic issues of the case. *State v. Thompson*, 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971).

The decision to grant a defendant's motion for a mistrial rests within the sound discretion of the trial court. *State v. Harris*, 181 *N.J.* 391, 518, 859 *A.*2d 364 (2004), *cert. denied*, 545 *U.S.* 1145, 125 *S.Ct.* 2973, 162 *L.Ed.*2d 898 (2005). The standard is

> whether or not the error is such that manifest injustice would result from continuance of the trial and submission of the case to the jury. The consideration of the mistrial motion, however, has one additional element, namely the court's determination of whether or not the prejudice resulting from the error is of a

nature which can be effectively cured by a cautionary instruction or other curative
steps.

[Pressler & Verniero, *supra*, comment 5.1 on *R.* 3:20–1.]

The grant of a mistrial is an extraordinary remedy that should be
exercised only to prevent manifest injustice. *State v. Ribalta*, 277
*N.J.Super.* 277, 291, 649 *A.*2d 862 (App.Div.1994), *certif. denied*,
139 *N.J.* 442, 655 *A.*2d 444 (1995).

Here, as the court explained, the complained-of evidence was
relevant, under *N.J.R.E.* 401, for the purpose of demonstrating
why plaintiff believed it was necessary to remediate the mold in
the building, especially given defendant's contrary position.
Moreover, prior to allowing the jurors to hear the challenged
evidence, the court provided them with a limiting instruction,
specifically explaining the limited purpose of the proposed testimo-
ny, and explaining that there were no allegations that anybody at
the Belmont had become ill and that there were no health relat-
ed/personal injury claims in the case. The jury is presumed to
have adhered to the court's instruction. *State v. Feaster*, 156 *N.J.*
1, 65, 716 *A.*2d 395 (1998); *State v. Manley*, 54 *N.J.* 259, 271, 255
*A.*2d 193 (1969).

Finally, defendant's interpretation of the record is substantially
at odds with ours. Contrary to defendant's claim, we find no
willful violations of the court's evidential ruling. Instead, there
appeared to be genuine confusion as to what exactly was permit-
ted under that ruling. Indeed, plaintiff's counsel immediately
accepted the court's request for a sidebar to allow her to explain
to plaintiff's expert witness what was allowed under the court's
prior ruling, and, in fact, asked the court for "more guidance" to
avoid any further confusion. Moreover, the court never admon-
ished plaintiff's counsel or expert witness for "stepping over the
line." *See Barber v. ShopRite of Englewood & Assocs., Inc.*, 406
*N.J.Super.* 32, 53, 966 *A.*2d 93 (App.Div.) (defendant deprived of
fair trial where "plaintiff's counsel persisted 'in making unwarrant-
ed prejudicial appeals to [the] jury' and . . . the trial court did not
adequately respond to defendant's objections"), *certif. denied*, 200
*N.J.* 210, 976 *A.*2d 386 (2009).

Accordingly, the court did not abuse its discretion in admitting the challenged evidence, *Wilson, supra,* 135 *N.J.* at 20, 637 *A.*2d 1237, much less in declining to grant defendants' request for the extraordinary remedy of a mistrial, *Ribalta, supra,* 277 *N.J.Super.* at 291, 649 *A.*2d 862.

## VI.

Lastly, defendant contends that the court wrongly permitted plaintiff to voluntarily dismiss its claims against Commerce Construction Management, L.L.C., without prejudice, after failing to prove a prima facie case at trial, arguing that "the claims against Commerce Construction should have been *either* dismissed with prejudice for failure to prove its case, or ordered counsel to reimburse defense fees and costs in the underlying matter."

Commerce did not file an appeal (or cross-appeal) from the court's judgment or order voluntarily dismissing plaintiff's claim without prejudice. Notwithstanding the fact that defendant would not have had standing to do so, *see Rule* 4:26–1 (real party in interest), defendant did not appeal from that judgment or order either; it is not designated in defendant's notice of appeal.

"It is a fundamental of appellate practice that we only have jurisdiction to review orders that have been appealed to us." *State v. Rambo,* 401 *N.J.Super.* 506, 520, 951 *A.*2d 1075 (App.Div.), *certif. denied,* 197 *N.J.* 258, 962 *A.*2d 529 (2008), *cert. denied,* 556 *U.S.* 1225, 129 *S.Ct.* 2165, 173 *L.Ed.*2d 1162 (2009). *See also 1266 Apartment Corp. v. New Horizon Deli, Inc.,* 368 *N.J.Super.* 456, 459, 847 *A.*2d 9 (App.Div.2004) ("[O]nly the judgment or orders designated in the notice of appeal ... are subject to the appeal process and review.").

Accordingly, because the issue is not properly before the court, and the court lacks jurisdiction to review it, we do not address it.

## VII.

We would be remiss if we did not address an issue raised for the first time at oral argument concerning the ownership,

distribution and use of monies recovered in *excess* of the actual cost of repairing the water damage to the common elements. At oral argument, the Association's counsel suggested that the treble or punitive portion of the damage award belonged to the unit owners and should be distributed accordingly. She explained that the Association intended to distribute the excess money to twenty-two current and former unit owners who paid additional assessments as a result of the defects in the common elements.

Although we find no case dealing with the distribution of such excess damages in a condominium context, we are of the view that, as with standing, the Association, acting in a representative capacity, and not the individual unit owners, owns the trebled portion of the CFA damages. This is because the jury awarded damages as a result of defects in the common elements, not in the individual units. Accordingly, because the unit owners were not named plaintiffs and lacked standing to sue for damages to the common elements, the Association, as the real party in interest, is the owner of all the damages awarded for defects to the common elements.[4] The individual unit owners could not have sued in an individual capacity for damages to the common elements, and therefore they should not be entitled to individual recoveries just because, once the amount needed to make all necessary repairs was trebled under the CFA, it exceeded the amount needed to make the repairs.

Thus, as owner of the monies recovered and owing a fiduciary duty to all unit owners, the Association's use and distribution is to be determined by that entity's governing documents, including its Master Deed, Charter and By-laws. For example, Article 15 of the Master Deed, entitled "Damage or Destruction to Property," provides:

If the Building, any improvement or Common Element or any part thereof is damaged or destroyed by fire or casualty, the repair, restoration or ultimate disposition of any insurance proceeds shall be in accordance with the following:

---

[4] None of the individual unit owners participated as a named party in the litigation below or in this appeal.

. . . .

(e). *Excess Insurance Proceeds.* If the amount of available insurance proceeds should exceed the cost of any such reconstruction or repair, the excess shall be retained by the Association and applied by it to reduce the Common Expenses.

Although the Association's Charter and By-laws were not included in the appellate record, in Wendell A. Smith et al., *New Jersey Condominium & Community Association Law* (Gann 2013), the authors set forth "[a] sample of all basic Master Deed provisions," as well as "[a] sample of all basic [by-law] provisions." Smith, et al., *supra,* at §§ 6, 8. Section 8:7.10 of the model by-law provisions set forth in *New Jersey Condominium & Community Association Law,* entitled "Assessment of Expenses in Actions by or against Association; Allocation of Awards," provides, in pertinent part:

b. Allocation of Awards. Money judgments recovered by the Association in any action or proceeding brought hereunder, including costs, penalties or damages shall be deemed a special fund to be applied to (1) the payment of unpaid litigation expenses; (2) Common Expense Assessments, if the recovery thereof was the purpose of the litigation; (3) repair or reconstruction of the Common Elements if recovery of damages to same was the purpose for the litigation; and (4) any amount not applied to (1), (2), and (3) above shall at the discretion of the Board be treated either as (i) a common surplus which shall be allocated and distributed pursuant to the provisions of Section 6.04 of the Master Deed [see 6:6] or (ii) a set off against the Common Expense Assessments generally. Despite the foregoing, if a Unit Owner(s), the Board or any other person or legal entity affected by any such distribution, shall assert that the damages sustained by a Unit Owner(s) was disproportionate to his allocated amount of any common surplus, the matter shall be submitted to binding arbitration. . . .

This model provision sets forth specifically how the excess money should be used. We do not know whether the Association's By–Laws contain an identical or corresponding provision, although we note that the Association's Master Deed, which was provided, mirrors the provisions set forth in *New Jersey Condominium & Community Association Law.* In any event, the point is that the Association's governing documents will determine the use of the excess money, which, if similar to the model provision, will most likely be for future repairs and maintenance of the common elements and to set off future common expense assessments.

And finally, as to defendant's contention that the Association would be reaping a windfall as a result of the award of treble damages, the simple answer is that in New Jersey, the assessment of treble damages and attorney's fees is mandatory when a violation of the CFA has been proven. *Skeer v. EMK Motors, Inc.*, 187 *N.J.Super.* 465, 468–70, 455 *A.*2d 508 (App.Div.1982); *N.J.S.A.* 56:8–19. Indeed, as we have noted, the provisions of the CFA permitting the recovery of treble damages are deliberately punitive. *See Liberty Mut., supra,* 186 *N.J.* at 185, 892 *A.*2d 1240 ("Treble damages are intended to punish, and only partly to compensate, and therefore have all the hallmarks of punitive damages.") (Albin, J., dissenting); *Furst, supra,* 182 *N.J.* at 12, 860 *A.*2d 435 ("The purpose of [the CFA] remedies is not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices."). Thus, once a violation of the CFA by defendant was proven, the trial court was required to award plaintiff treble damages.

The jury's damage award is affirmed in part, and reversed in part; we reverse the award of prejudgment interest on the punitive portion of the CFA damages award; and remand for the purpose of vacating the award for the cost of the replacement windows and the recalculation of the prejudgment interest award.